## BALTIMORE, CRISFIELD & ONANCOCK LINE, Inc., v. UNITED STATES.

### No. 5166.

Circuit Court of Appeals, Fourth Circuit.

Jan. 17, 1944.

Leon T. Seawell, of Norfolk, Va., and Theodore R. Dankmeyer, of Baltimore, Md., for appellant.

Arnold W. Knauth, Atty., Department of Justice, of Washington, D. C. (Francis M. Shea, Asst. Atty. Gen., and Sterling Hutcheson, U. S. Atty., and Russell T. Bradford, Asst. U. S. Atty., both of Norfolk, Va., on the brief), for appellee.

Before PARKER and DOBIE, Circuit Judges, and WARING, District Judge.

WARING, District Judge.

The U. S. S. Texas, a Spanish American War battleship, having become obsolete, it was determined by the government to use her as a target for the purpose of ascertaining the effect of gun fire and other destructive methods of war. The ship's name was changed to San Marcos. She was of course a public vessel owned and operated by the United States of America. On March 10, 1911, the San Marcos was deliberately used as a target by the United States Navy and sunk in the Chesapeake Bay near the lower entrance to Tangier Sound about 6½ miles from Tangier Sound lighthouse in about 30 feet of water. After settling to the bottom a considerable portion of the vessel still projected above the water and as late as 1940 some 200 linear feet of the former vessel still projected from two to six feet above the surface of the water. No light or other marking was placed upon the wreck, but the location was regularly marked by a nearby lighted buoy. The location of this wreck was shown on government charts. In the year 1921 the government again used this wreck as a target in tests of air plane bombing. In 1924 the Navy Department advertised certain wrecks in Tangier Sound, including the San Marcos and two other old battleships, namely, the Indiana and the Alabama, which had been used for similar purposes. The wrecks of the Indiana and the Alabama were sold and the material of which they were made subsequently removed by the purchasers. The San Marcos was not sold and continued to lie in the same location. The buoy situated near the wreck was from time to time moved and located at varying distances, at times 500 to 1500 feet, and at other times as much as two miles from the wreck. In the year 1940 its location was about 500 feet in a southerly direction from the wreck.

On January 28, 1940, this locality suffered a severe spell of cold weather and many buoys became encrusted with ice, some of them capsized and they were in danger of being dragged under water and damaged. On account of this condition the buoy near the wreck of the San Marcos was removed and an unlighted buoy was dropped in its place to indicate the location. The regular "Notice to Mariners" was issued when the lighted buoy was replaced by the unlighted buoy. This was the usual public notice, but there is nothing in the evidence to show that such notice ever came to the attention of either the Master of the Lexington or the libellant, the owner of said vessel, although it was publicly exhibited and available to all Masters of vessels or others interested in navigation. The removal of buoys under these conditions was not unusual and a large number of other buoys, as shown by the notice, had been removed. It was in evidence that similar conditions had prevailed in other years causing extensive temporary removal of buoys.

In January and February 1940, due to this severe cold spell, a large portion of the Chesapeake Bay was frozen over and navigation seriously impaired and in great part halted. About February 26, 1940, the ice condition having improved, the libellant, Baltimore, Crisfield & Onancock Line, Inc., resumed operation of its freight vessel, the Lexington; its Master and Captain being R. C. Edwards. The Lexington was a diesel motored freighter of 200 horse power, about 120 feet long and 40 foot

beam, of 230 tons, and her draught was about 11 feet. She had a deck house all over the hull and the pilot house was located on top of the deck house, the same being about 18 feet above the water and about 15 feet from the stem. The boat carried an electric search light, but at the time of the collision hereinafter described this was not in working order. The route on which this vessel operated was a run by night from Baltimore to Crisfield, then by day from Crisfield to Onancock, and then by night some times via Crisfield and some times direct to Baltimore. The vessel made three of these round trips a week and all of them were made through Tangier Sound until the trip on which the Lexington was lost.

On March 27, 1940, the Lexington proceeded southerly through Tangier Sound from Crisfield to Onancock during the day and there took aboard a cargo of canned goods and other articles and sailed direct for Baltimore at about 6:15 p.m. The Lexington proceeded down Onancock Creek on the ebb tide in charge of her Mate, I. W. Scott, and reached the buoys at the entrance of the creek at approximately 7 p.m. The Mate then turned the vessel over to Captain Edwards, who continued in charge of its navigation. The Captain and a helmsman were in the pilot house and the ship's engineer was on duty in the engine room. It is in evidence that the engines were stepped up a bit because the boat was heavily loaded and it was desired to reach Baltimore in time to make connections. The Captain set his course expecting to pass about 500 yards southerly of the San Marcos wreck. The sky was overcast and visibility poor. The Tangier light was seen for a time and then lost to view and no other lights to the west were visible. The Captain testified that he expected to see a light on the buoy at the San Marcos wreck and was not aware that the buoy was unlighted. After going about 65 minutes, which he considered placed him past the wreck, he was preparing to alter his course when the Lexington ran at full speed upon the San Marcos wreck and stuck there. The hull was badly damaged and taking in water. The crew lowered the life boat and transferred themselves dry shod to the San Marcos wreck. In about thirty minutes the Lexington sank entirely below the water and the next morning the Captain and crew were picked up by a passing vessel and taken ashore.

It appears that after the ice condition on the Chesapeake Bay had improved in the latter part of February 1940, the Coast Guard commenced the work of repairing and replacing buoys. The work of course took some time as only a limited number of buoys could be handled by the tenders and careful calculations had to be made for replacing and relocation of buoys in proper positions. The entire work of replacing buoys and other aids to navigation took several months and the lighted buoy near the San Marcos wreck was replaced on April 4, 1940.

The vessel Lexington with all of its cargo was a total loss. The owner of the vessel, the libellant in this cause, filed a libel against the United States alleging that the United States as the owner of the vessel San Marcos failed to maintain a lighted buoy at the time of the collision and that the United States was further negligent in that its Light House Department and Coast Guard Department did not replace the lighted buoy within a reasonable time after the weather conditions had cleared up. The libel prays for damages of $35,000 for the vessel and $6,000 for the cargo. Suit was brought under the Act of 1925, commonly known as the "Public Vessels Act". 46 U.S.C.A. § 781.

Libellant's case is based upon the claim that the San Marcos was a public vessel of the United States and therefore, within the purview of the Public Vessels Act, and that, although this vessel was sunk many years before, it still remained a public vessel since it had never been abandoned or disposed of by the United States and the United States was, therefore, liable to protect the public from injury by this public vessel. It is further claimed that the Coast Guard was negligent in not replacing the lighted buoy more promptly and that the United States Government is liable for the failure and negligence of the Coast Guard, which is one of its departments.

The Act allowing libels in admiralty against public vessels will be found in 46 U.S.C.A. § 781, and provides that a libel may be filed against the United States for damages caused by a public vessel. In other words, this Act provided a remedy to parties damaged by public vessels of the United States and placed them substantially in the same category as privately operated vessels. It is necessary of course under this Act that the object causing the injury be a public vessel and that there be negli-

gence. The libellant claims that the San Marcos having been a public war vessel belonging to the United States Government was not divested of its character as such a vessel because of the fact that it had been sunken for a period of some twenty nine years. To put it tersely the contention is that once a public ship always a public ship whether floating or sunken and that the government never changed the status of this vessel or took any steps to abandon or remove it. On the other hand, the government contends that when this vessel was used as a target and for all intents and purposes destroyed as a vessel it became an abandoned pile of scrap and junk with no attributes or characteristics of a vessel and that it was so shown on charts and commonly known by seafaring men and that the placing of a buoy to warn other vessels of danger in approaching this spot was but a part of general governmental supervision of navigable waters whereby it endeavors to chart for and warn, navigators of dangers to navigation. The government does this to shoals, rocks, sunken wrecks and other obstructions. If this wreck had lost its character as a public vessel and had become a mere "pile of junk", as it has been some times denominated in this case, the government would not be responsible for the wreck of the Lexington. Therefore, the first and controlling point in this case to be considered is whether the wreck of the San Marcos was a public vessel within the purview of Section 781, 46 U.S.C.A., at the time that the Lexington collided with it on March 27, 1940. The pertinent portion of the Section is as follows: "A libel in personam * * * may be brought against the United States * * * for damages caused by a public vessel of the United States, * * *: Provided, That the cause of action arose after the 6th day of April, 1920 (Mar. 3, 1925, c. 428, § 1, 43 Stat. 1112)."

Another point raised in the case is whether or not the Coast Guard was negligent in not replacing buoys. The District Court found against the libellant in these contentions and also found that the Lexington was negligently operated. In view of our finding on the first of these points it is unnecessary for us to go into or discuss the second and third points.

■ The main case cited and relied upon is that of Eastern Transportation Co. v. United States, 272 U.S. 675, 47 S.Ct.

289, 71 L.Ed. 472, decided in 1927, and usually cited as the Snug Harbor case. In that case the vessel Snug Harbor sank after a collision in August 1920. Exactly thirty days later the vessel Winstead ran upon the Snug Harbor wreck and was lost and its owner brought suit. Recovery was had. However, the facts are widely different from those in the instant case. The vessel sank and was wholly submerged, whereas the San Marcos was always visible above the water. No attempt was made to locate the wreck of the Snug Harbor or mark it and the collision by which the Winstead was lost occurred only thirty days after the Snug Harbor had sunk, thus the thirty day period provided by Congress for the presumptive abandonment of a wreck by its owner had not yet expired. See Rivers and Harbors Act of 1899, 33 U.S.C.A. §§ 409 and 414. Under the terms of that Act, a wreck that obstructs navigation remains the responsibility and liability of the owner for a period of thirty days unless he sooner gives notice that he has abandoned same. It will, therefore, be seen that the Snug Harbor had not been abandoned and its owner, which was the government, having consented to be sued as a private owner (Public Vessels Act), was responsible for the condition of this wreck and its location and marking, the thirty days not having elapsed. The San Marcos, however, had been sunk for some twenty nine years, its location had been shown as a wreck by charts; and buoys had actually been placed to mark it as an obstruction to navigation. It is inconceivable to hold that this wreck and remnants of a vessel are still to be considered as a public vessel and liable to be libelled under the Act hereinabove referred to. The Wreck Statute does not require the government to remove a wreck, but merely provides that when the owner has abandoned it the government may enter, raise it, remove it, or if necessary, blow it up. The Act gives to the government certain rights within certain limitations to carry out its governmental function in making navigable waters safer by removing, destroying or otherwise disposing of dangers to navigation. But no where have we found any authority which places upon the United States Government a liability to pay damages to those who may have suffered losses by shipwreck or damage caused by obstructions to navigation because the

government had not sufficiently or adequately marked such obstructions. As a matter of fact, the government does mark old wrecks, which were former public or private vessels, just as it marks shoals, rocks and other dangerous places. It does this in its general public duties and not in the performance of a private ship owner's duty, or as required by any statute under which it renders itself liable to suit for damages.

■ The Supreme Court decision in the Snug Harbor case shows how the Public Vessels Act deprives the government of its immunity as a Sovereign in the operation of its public vessels and allows a recovery if it can be shown that the government was negligent when one of its ships has sunk and is a menace to navigation. In that case, however, there was no question but that the vessel, although sunken, was still a vessel and the owner was under a duty to comply with the terms of what is commonly known as the "Wreck Statute", 33 U.S.C.A. § 409 et seq. The Wreck Statute provides that the owner of a vessel, which sinks in a navigable channel, shall have it marked with a buoy or beacon until the vessel is removed or abandoned. Section 414 provides that where such sunken vessel has been an obstruction for more than thirty days, or whenever it can be shown that the obstruction has been abandoned in less time, such sunken vessel shall be subject to be broken up and removed by the Secretary of War at his discretion. In the Snug Harbor case the vessel sank on August 15, 1920, and another vessel collided with the wreck on September 14, 1920, a period of exactly thirty days. The United States was the operator of the Snug Harbor and had not taken any steps to mark the wreck or comply with the terms and requirements of the Wreck Statute. In the instant case the San Marcos had been wholly destroyed as a navigable and usable vessel in 1911. The wreck was a twisted mass of steel and other material. The government treated the wreck as an abandoned wreck and placed a buoy to show its location in aid of navigation. This buoy it maintained and serviced; the wreck was shown on the government charts; and a public notice to mariners was published when it became necessary to temporarily remove the lighted buoy. It cannot be shown that this wreck retained any of the characteristics of a vessel and if it was not a vessel then a libel would not lie under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., as applied to public vessels.

■ It is said in argument that the government never abandoned this vessel, 33 U.S.C.A. § 409, because it never took any positive action to that end by sending itself written notice or some similar act. To have done this would have been an act of mere futility. The thirty day requirement is provided so that the government cannot step in and take charge of and dispose of a private owner's vessel within such period unless the owner actually gives notice of the abandonment. It is plain to see that the reason for this is that the sunken vessel may have great value and the owner expects to raise or salvage it. If, however, he considers it a loss and wishes the government to step in he can make announcement of the abandonment. In the present case the vessel was owned by the United States and it would have been an idle gesture for it to write a letter to itself giving notice that it had abandoned the vessel and that it, itself, could proceed to remove it, mark it or do anything else it pleased.

The appellant has cited a number of authorities and our independent search has disclosed others where vessels which have been wrecked were raised, repaired and some times rebuilt, and were still recognized as subject to maritime liens. But in all of these cases the vessels had continued to retain their character as vessels although temporarily out of use because of the fact that the owners still considered them vessels and actually attempted to raise and use them or purposely retained title. See The Port Hunter, D. C., 6 Fed.Supp. 1009; The George W. Elder, 9 Cir., 206 F. 268. But in the case of the San Marcos the ship was purposely and deliberately shot to pieces, sunk and rendered unusable as a vessel. It was in fact converted into a mass of scrap and pile of junk and there is no evidence or showing that the government ever retained the slightest intention to repair, rebuild or again use this as a ship.

■ The United States is of course not liable for obstructions to navigation as is a private party. A private party may be liable for maintaining a public nuisance such as permitting rocks from stone abutments to be scattered on a river bottom. See Corby v. Ramsdell, 2 Cir., 48 F.2d 701. But in that case the liability was based upon a tort committed by a private person.

Of course the United States is not liable for torts of that character and obstructions to navigation caused or permitted to remain are not subjects for suits against the United States except where they can be shown to come within some special statute permitting a suit. Such a statute is the "Public Vessels Act" where the United States can be held liable for a tort committed by a public vessel. If the damage was caused by an obstruction such as a rock, pile of iron or other junk, then it would not be liable and that was the situation in the case at bar.

We agree with the District Court that the San Marcos had lost its character as a public vessel and as a matter of fact was no longer a vessel of any kind and that the libel was properly dismissed upon that ground.

In view of our holding as to the character of the wreck of the San Marcos it is unnecessary to discuss or pass upon the other features of the case.

The decree of the District Court is affirmed.