**SOMERSET SEAFOOD CO. v. UNITED STATES.**

**Civ. A. No. 4912.**

United States District Court
D. Maryland, Civil Division.

Jan. 18, 1951.

William Pepper Constable, John D. Alexander, Donald D. Webster, Baltimore, Md., for plaintiff.

Bernard J. Flynn, U. S. Atty., James B. Murphy, Asst. U. S. Atty., Baltimore, Md., Thomas F. McGovern, Sp. Asst. to Atty. Gen., for defendant.

CHESNUT, District Judge.

This case presents another novel question under the Federal Tort Claims Act. 28 U.S.C.A. §§ 1346, 2671 et seq. On October 15, 1949, about 4 A.M., a power operated oyster boat belonging to the plaintiff, stranded on the submerged wreck of the old battleship Texas which, in 1911 had been.intentionally sunk as the result of target practice in the lower Chesapeake Bay in Virginia waters. The plaintiff contends that the buoy marking the wreck was negligently placed too far from the wreck itself; that the stranding of its boat was proximately caused thereby and also that the submerged wreck constituted a continuing nuisance. On the other hand, the United States contends (1) that there was no negligence in the placing of the buoy; (2) that the stranding was directly and proximately due to incompetent navigation and (3) that the United States is not liable under the Federal Tort Claims Act for an accident of this kind occurring in navigable waters. From the evidence in the case I make the following findings of fact.

1. In 1910, 36 Stat. 612, Congress by an amendment to the Navy Department appropriations act required that an experimental test attack be made at battle range upon a fully armored battleship. This proviso was added from the floor by Admiral Richmond P. Hobson, U.S.N. (Ret.), who suggested that the old battleship Texas be used, 45 Cong. Rec. 4292–4294. In 1911 the old battleship Texas which was then an obsolete vessel, was taken out, struck from the Navy register of commissioned vessels, used as a target and for experimental purposes, and sunk southwest of Tangier Island where she presently remains. The wreck's name was changed to the San Marcos and she has been marked by a buoy ever since 1911. The wreck lies in about 30 feet of water and is situated about 6½ miles southwest of Tangier Sound Light House and about

5 miles east of the main ship channel up the Chesapeake Bay to Baltimore. Prior to 1940 some part of the superstructure of the San Marcos was visible at high tide but for several years past it has been just about fully submerged except at quite low tide. The mean tidal range at the wreck is approximately 1.6 feet.

2. In 1921, General William Mitchell, U.S.A., used the wreck of the Texas and two other battleships, the Indiana and the Alabama, for targets in an experiment to prove that battleships could be sunk by air power. In 1924 the three battleships were advertised for sale and described in the sale catalogue as having been used for targets and for experimental purposes. Merritt-Chapman & Scott bid in all three vessels, but requested permission from the Army Engineers to remove only the Indiana and Alabama. The San Marcos was returned to the Government.

3. Some time prior to March 27, 1940, The San Marcos was legally abandoned to the United States Engineers under the Wreck Statute, 33 U.S.C.A. § 409 et seq., as held by the Court of Appeals in Baltimore, Crisfield & Onancock Line v. United States, 4 Cir., 140 F.2d 230, 234. On March 27, 1940, the freight vessel Lexington ran on the wreck and became a total loss. The Lexington was formally abandoned to the United States Engineers in 1940. By letter of April 23, 1940, the District Engineer reported through the Divisional Engineer to the Chief Engineer at Washington, that:

"The wreck lies on its side, and alongside to the S.E. of the wreck 'Texas'. There is 34 feet of water alongside and 13 feet of water over the highest part. No part is visible.

"It is not believed to be a menace to navigation, as it is alongside of a wreck which is marked by a lighted buoy maintained by the U.S. Coast Guard and the location of the former wreck is shown on Coast and Geodetic Charts.

"It is recommended that the wreck be not removed."

After receiving the report the Chief of Engineers at Washington replied that no action would be taken. In 1940 the buoy was about 500 feet from the wreck. Prior to this date the buoy had been at various distances from 500–1500 or more feet from the wreck. During the Second World War the area surrounding the wreck was designated a danger zone, known as a Naval firing range, duly published in the Federal Register, placed upon the charts and published in the Coast Pilot. The regulations were continued after the war, pursuant to the authority of 33 U.S.C.A. § 3 and the regulations published at 33 C.F.R. 204.46.

4. In September 1948 a motorboat from Urbana, the Fay Ray, owned and operated by Everett Owen, an insurance man and member of the Coast Guard Auxiliary, ran on the San Marcos wreck in broad daylight, having mistaken the San Marcos wreck buoy for the Nun buoy 6, having assumed a ten degree error in his compass which in fact had been corrected by the co-owner the previous week.

5. Subsequent to this collision, a commodore of the Coast Guard Auxiliary, a voluntary organization of yachtsmen affiliated with, but not paid by the Coast Guard, on September 29, 1948, complained that the San Marcos wreck was in a dangerous condition and recommended that "the remaining superstructure of the wreck should now be blown away until there is a clearance of not less than three fathoms left over it." On October 21, 1948, an employee of the office of the Baltimore District Engineer, J. L. Reynolds, made an inspection of the wreck and made recommendations for a fixed structure on the wreck. His inspection report resulted in a separate letter from the Office of the Chief of Engineers to the Commandant of the Coast Guard, dated November 19, 1948. The letter states: "Complete removal or demolition of the wreck would be impracticable. At the time of the inspection a lighted bell buoy located 300 yards to the southwest marked the wreck. The effectiveness of this aid could probably be increased if the buoy were placed closer to the wreck. However, because of the difficulties in keeping floating buoys in position, particularly under ice conditions, it is suggested that the Coast Guard give con-

sideration to the installation of a lighted fixed structure with mechanically operated whistle or bell." On December 1, 1948, the Commandant of the Coast Guard in Washington requested advice and information from the Commander, 5th Coast Guard District at Norfolk, on the following questions:

"Can subject buoy be placed closer to wreck? If affirmative, give distance and bearing, otherwise state reason why buoy cannot be placed closer to wreck.

"Furnish estimated cost to provide suitable aid to navigation on fixed structure as recommended in inclosure. Give intensity of such light and type of fog signal considered appropriate.

"Would two lighted buoys more satisfactorily mark subject wreck? If affirmative, give recommended locations for such buoys, type of buoys and their characteristics."

6. The Norfolk Coast Guard Aids to Navigation Office sent its lighthouse engineer out to look at the wreck and to determine whether there was sufficient left of the wreck to support a lighthouse. It was determined that the wreck would not support a lighthouse, that it would be necessary to drive caissons and to erect an elaborate structure. The Commander, 5th Coast Guard District at Norfolk, reported to the Commandant of the Coast Guard at Washington on February 9, 1949, as follows:

"While it is possible to place the buoy closer to the wreck, this action is not deemed practicable due to the added danger created in connection with tenders servicing the aid. The buoy is now located a distance from the wreck that is usual and normal in open waters as in this case.

"An investigation of the possibilities of erecting a light on the wreck has been undertaken and the findings indicate that the establishment of a structure adequate to hold a minor fixed light and automatic fog signal, together with the necessary approach platform, would require an elaborate structure. The use of a reinforced concrete base is considered necessary for any permanency and the estimated cost of construction of such an aid is $30,000.00. The wreck has been used as a bombing target and the only usable section is one about 10 feet in diameter with approximately two feet of water over it.

"The use of two (2) lighted buoys to mark the wreck is not considered a necessity and is not deemed advisable. The buoy which now marks the wreck is held to be so located that sufficient warning of the obstruction is given a prudent mariner navigating with the normal knowledge and precaution expected in approaching a known, charted danger."

7. Under Coast Guard regulations and administrative practices, the determination of how close it is practicable to place a buoy to a wreck and to permit the buoy to be serviced is in the hands of the commanding officer of the buoy tender which places the buoy and which has to service it. The determination of whether it is practicable to build a lighthouse is vested in the Commandant of the Coast Guard at Washington.

8. On February 18, 1949, the Commandant, Coast Guard Headquarters, Washington, advised the Chief of Engineers, Washington, that: "A field examination of the condition of San Marcos Wreck discloses that it is not practicable to place subject buoy closer to the wreck than at present. It is believed that charting of the obstruction and the present marking as now located with respect to the wreck is sufficient warning for a prudent mariner navigating with normal knowledge and precaution expected in approaching a known, charted danger." The Commandant of the Coast Guard in the same letter advised that it would cost about $30,000 to build a lighthouse, that if the Corps of Engineers desired to replace the buoy with a lighthouse the Coast Guard would do the work on a reimbursable basis under the provisions of 33 U.S.C.A. § 736, and that no further action would be taken by the Coast Guard unless further advised by the Office of the Chief of Engineers. Before writing this letter to the Chief of Engineers, the Commandant of the Coast Guard had obtained a legal opinion from his Chief Counsel that under the decision of the Court of Appeals in Baltimore, Crisfield & Onancock Line v. United States,

the wreck of the San Marcos was to be treated as if it had been formally abandoned to the United States Engineers.

9. The Office of the Chief of Engineers in Washington exercised the discretion vested in the Secretary of War as to wreck removal and determined that this wreck was not to be removed and that a permanent lighthouse would not be constructed at the wreck. This decision was communicated to the District Engineer at Baltimore by endorsement dated March 24, 1949, using the words of art, "To note", and was duly "Noted" by the District Engineer on March 28, 1949. Under administrative practice this notation meant that nothing was to be done.

10. The San Marcos wreck buoy is Light No. 1892 in the Light List, Atlantic and Gulf Coast, 1949. Its location is given as 37°43.1' N, 76°04.8' W. The light is 12 feet above the water and shows an interrupted, quick flashing white light and has a bell. It is marked with red and black horizontal bands, with red top. The buoy is marked on U.S.C. & G.S. Chart No. 1223 at the position shown by the dot below the diamond.

11. The particular buoy which was in this position at the time the T. H. Anderson ran into the wreck had been placed there by the buoy tender Mistletoe on September 26, 1949. At this time the position of the buoy was checked by sextant angles taken on three permanent shore positions and her position was found to be precisely at the point marked on Chart No. 1223. This buoy was moored with 150 feet of 1½" chain to a 5,000 lb. iron sinker. The Buoy showed 12 feet above water and extended 16 feet below water. It remained in this position at all times up to February 24, 1950, when the buoy tender Mistletoe measured the distance and found the buoy to be 175 yards, 233° T. from the nearest part of the wreck. The plaintiff's measurement put the buoy 851 feet from the wreck; but I accept as more satisfactory the defendant's measurement as just stated.

12. The T. H. Anderson had on board at the time of the accident United States C. & G.S. Chart No. 1223 which showed the wreck and showed the position of the buoy using the standard symbols for wrecks and buoys. The T. H. Anderson also had on board U.S. Coast Pilot, Atlantic Coast, Section C, which gave a suggested course which passed the buoy .9 mile from the wreck and also identified the San Marcos wreck as being in a danger zone which was set forth in the Coast Pilot and is also shown on Chart No. 1223.

13. There is plenty of water for small vessels to give the wreck adequate sea room; and prudent mariners pass the wreck with ½ mile to a mile clearance. The course given by the captain of the T. H. Anderson to his mate would have passed the wreck to the southerly a considerable distance off the wreck.

14. On the night of October 15, 1949, the oyster seed boat T. H. Anderson, (owned by plaintiff corporation which owns a large fleet of vessels), a vessel 66 feet long, 24½ feet beam, and draft of about 6 feet when loaded and speed of about 4-5 miles, having on board a white master, Levin Anderson; a colored mate, Lennie Carter; and a white hand, Jabez Webster, and carrying as passengers two oyster boatmen from another vessel, Irvin Abbott and Floyd Whitelock, with a deck load of seed oysters, was proceeding from the vicinity of Windmill Point on the western shore towards Tangier Sound, near the Eastern Shore of the Chesapeake Bay. The Anderson had a wooden hull, was Deisel propelled and laden at the time with 2200 bushels of seed oysters. She was physically seaworthy and properly equipped, with the exception that at the time of stranding she was being steered by a mate who was not a competent mariner as hereinafter more fully stated. Weather and tide conditions at the time of the accident were—wind approximately northeast; force about 10 miles; partly cloudy; moderately rough seas. The tide was flood running northerly into Tangier Sound and nearly high tide.

15. The master of the vessel had been up the night before and at a point about 1½ miles northeast of Windmill Point he turned the vessel over to his mate, Lennie Carter, with instructions to steer northeast by east and to call the captain at Tan-

gier Island Light. This occurred at approximately 2:00 A.M. The hand and the two passengers were asleep in the three bunks located behind the helmsman in the small pilothouse. Captain Anderson routed out the hand from his bunk and told him to sleep on the floor while he took the bunk.

16. The mate, Lennie Carter, is a young colored man about 25 years old who resided at the hailing port of the vessel, Deal Island, Maryland, all his life. For some years past he had had seasonal occupation on boats and had from time to time been employed by the plaintiff for that service. He had had only a limited education, was not a licensed pilot and his evidence in the case as a witness quite clearly showed that though doubtless well intentioned he was not a competent navigator and could probably have been trusted to navigate even a small boat such as the Anderson only under very simple and not difficult or dangerous conditions. He had been employed on the Anderson for some little time prior to the accident and on occasions had been permitted to steer the boat; but he was not competent to read or understand the chart or to lay out a proper course to be steered. His vision was not good owing to the fact that he was cross-eyed and had been rejected for the Army in 1943 by reason of defective eyesight. He would not have been able to qualify for an able bodied seaman's certificate. Jabez Webster, the other crew member, had adequate vision.

17. The master of the Anderson was also named Anderson. He had had several years' experience as master or captain of small boats of the Anderson class and recently made several trips in the Anderson from Deal's Island southwesterly and running past the buoy for the San Marcos wreck, with which for some years he was generally familiar. Prior to 1944 he had frequently seen the superstructure of the wreck when it was out of water and the buoy remained in the same place from 1936 to 1950. He must have known approximately the distance of the buoy from the wreck which he also knew was almost due north from the buoy. The mate, Lennie Carter, had accompanied Anderson on the boat for about 5 trips during the 1949 season before the collision. Anderson had told Carter about the wreck and not to keep close to it. He had also shown Carter the location of the buoy on the chart. On one or more occasions in 1949 when Carter was on the boat it had passed the buoy a good distance to the south. When he turned the wheel over to mate Carter about 2:00 A.M., and about 10 miles from the buoy, he told Carter to keep the boat on the course which he had then laid out which was northeast by east, and which course if kept and pursued would have taken the Anderson at least half a mile southerly from the buoy which would thus have been passed by the Anderson on her port side. He told Carter to call him at Tangier Light as he felt it necessary for him to personally take the boat through the shoals of Tangier Sound. The wreck of the San Marcos lay about 525 feet almost due north (only slightly northeast) of the buoy. The distance of the wreck from the buoy is not shown on the chart because the scale is too small to permit it to be done.

18. The Anderson approached the San Marcos wreck buoy from the southwest and mate Carter identified the buoy as the wreck buoy. He said he thought he had not seen the light from Tangier Sound Lighthouse which, under fair conditions of ordinary visibility was visible 8 to 10 miles away, and therefore under such conditions should have been seen when the Anderson was near to the buoy. Carter as a witness stated that as he was approaching the buoy dead ahead he decided not to go to the south but to the north of the buoy; that is to pass the buoy on his starboard side, and to do this he changed the course to go to the westward of the buoy passing the buoy on his starboard. He then claims to have changed the course from northeast by east to north a little west, and then after pursuing this changed course for what he estimated to be a quarter of a mile, he was trying to turn back to the northeast by east course when he stranded on the wreck. When the crew and passengers on the stranded Anderson were rescued later in the day the direction of the Anderson as so stranded was northwest (337°30″), in which position she was firmly held by her deck-

304

load of oysters. This latter fact, together with other minor points of evidence argumentatively at least throws considerable doubt upon the accuracy of Carter's description of what caused the stranding, but for the purpose of the case I accept this statement in the absence of more certain proof. And it may be noted that after Captain Anderson was awakened by the stranding he apparently did not ask Carter just what caused the stranding.

19. The distance between the wreck and the buoy as it existed on October 15, 1949, was as near as practicable within the judgment of the officer of the buoy tender. The buoy weighs 8 to 10 tons and must be replaced, relighted and serviced. In order to lift a buoy of this size out of the water it is necessary to use a large buoy tender which must approach the buoy against the tide, come alongside the buoy and haul it aboard. This tender is 180 feet long. After the accident, on February 24, 1950, the Mistletoe moved the buoy to 75 yards from the wreck and shortened its chain to 90 feet. This is too close for the buoy tender to work the buoy except during the period of lowest tide when the buoy and its 90 feet of chain would be flowing away from the wreck. The present position of the buoy means that it cannot be serviced if it goes out during any time except low water and a calm sea. In the judgment of the captain of the buoy tender the present position of the buoy is possible but not practicable.

20. When the Anderson stranded on the wreck it was not in charge of a competent steersman and the stranding was proximately caused by the change by the mate in the course to be pursued, contrary to the instructions given him, which, if they had been followed by the mate would have taken the Anderson safely past the buoy and the wreck to the south. By permitting its vessel to be operated by an incompetent person who did not follow the instructions given by the master the plaintiff assumed the risk of running into obstacles, including well-known charted wrecks such as the San Marcos.

 It is elementary that the United States may not be sued without its consent. The kind of suit that is here presented is classed as a maritime tort. By the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., and in the Public Vessels Act, 46 U.S.C.A. § 781 et seq., Congress has given consent to admiralty suits against the United States for the maritime torts embraced in those Acts. The suit here is not under either of these Acts but under the Tort Claims Act. Nor would the circumstances of this case present a proper claim under the Suits in Admiralty or Public Vessels Acts. They are concerned principally with torts which may be committed by vessels owned and used by the United States as public vessels or as merchant vessels. But there are other types of maritime torts, as for instance, negligently placing piling or rip rap or other obstructions in navigable waters. State of Maryland to use of Pryor v. Miller, 4 Cir., 194 F. 775; Corby v. Ramsdell, 2 Cir., 48 F.2d 701.

In 1940 the freight boat Lexington, Baltimore, Crisfield & Onancock v. U. S., 4 Cir., 140 F.2d 230, collided with the then only partially submerged wreck of the Texas and its owner brought suit for damages under the Public Vessels Act. District Judge Way, 1943 A.M.C. 1013, held among other things that the collision was due to faulty navigation by the Lexington. In affirming his judgment the Court of Appeals found it unnecessary to pass on this issue of fact but held that the Texas must be considered to have been abandoned, under the Wreck Statute, and was not at the time of the accident a public vessel of the United States. The Federal Tort Claims Act became effective in 1946. The plaintiff here claims that it is applicable generally to maritime torts not embraced in the Suits in Admiralty or the Public Vessels Acts, which are expressly excepted by the Tort Claims Act. The defendant, however, contends that the Federal Tort Claims Act is inapplicable here, partly in that its legislative history shows that the intent of Congress was to include only common-law torts committed by governmental agents, in which Congress had given no consent to sue the United States.

The provisions of the Tort Act which require particular consideration here are now to be found in title 28 U.S.C.A. §§ 1346,

2674 and 2680. The broad general grant of consent to be sued for torts is found in section 1346(b) which provides that the District Courts—"shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

The test of liability is in section 2674 which provides—"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

Section 2680 lists 13 classes of cases which are expressly excepted from the grant of jurisdiction. The ones in point in this case are—"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. * * *

"(d) Any claim for which a remedy is provided by sections 741–752, 781–790 of Title 46, relating to claims or suits in admiralty against the United States."

The principal contention of the United States with respect to the applicability of the Tort Claims Act to this case is based on section 2680(d) just quoted. The references to title 46, 741–752 and 781–790 are to the Suits in Admiralty Act and the Public Vessels Act above mentioned. The

argument is that the specific reference to these two statutes with the explanatory phrase "relating to claims or suits in admiralty against the United States," shows the intention of Congress to except from the scope of the Act any and all suits which are or by their nature could be the basis of admiralty suits against the United States. And in this connection reference is also made to the language of section 1346 (b) which limits the grant of jurisdiction to cases involving circumstances "where the United States, if a private person, would be liable to the claimant in accordance with *the law of the place* where the act or omission occurred." (Italics supplied.)

The question of statutory construction here presented is not free from difficulty just as other cases involving the tort statute were in Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200; United States v. Spelar, 338 U.S. 217, 70 S.Ct. 10; United States v. Aetna Casualty & Surety Co., 338 U.S. 366, 70 S.Ct. 207, 12 A.L.R.2d 444, and Feres (Jefferson, Griggs) v. United States, 340 U.S. 135, 71 S.Ct. 153. In support of its contention in the instant case counsel for the United States relies largely upon extracts from the Congressional Record at various times, and during successive stages of consideration of the present Act and its predecessors, some of which do tend to show that at least some of the proponents of the measure were contrasting maritime torts with common law torts, and were possibly under the impression that the Suits in Admiralty Act and the Public Vessels Act completely covered the field of maritime torts for which the United States would be liable.[1] However, as we have noted, this impression seems to have been erroneous.

Counsel for the United States puts forward another supposed difficulty arising under the Torts Act with reference to the alleged liability of the defendant. It is said that the phrase in section 1346(b) reading "under circumstances where the United

1. See United States v. Spelar, 338 U.S. 217, 220, 70 S.Ct. 10, notes; Jefferson v. United States, D.C.Md., 77 F.Supp. 706, 712–714, affirmed 4 Cir., 178 F.2d 518, 340 U.S. 135, 71 S.Ct. 153.

States, if a private person, would be liable", and the same phrase in section 2674 reading "the United States shall be liable * *, in the same manner and to the same extent as a private individual under like circumstances" bars recovery of the plaintiff, because after a sunken ship has been abandoned by the owner, there is no further liability on the individual owner, and the duty of removing the wreck or marking it becomes the exclusive duty of the United States under the Wreck Act. And the argument is that in the instant case, as in the recent decision of the Supreme Court in the Feres (Jefferson, Griggs) case, supra, there is no parallel liability on the individual. But I do not think the limitation has the application here that it did in that case where the relationship of the parties was that of Government and soldier. Under the Wreck Act the initial liability is on the individual owner until abandonment and afterwards the government's duty is in substitution for the required initial activity of the individual. And particularly the contention should have no application in the present case where the government itself was the original owner and the abandonment, as determined by the Court of Appeals in this Circuit in Baltimore, Crisfield & Onancock Line, Inc. v. United States, 140 F.2d 230, supra, was the result of an action or lack of it between the two administrative departments of the government. And with respect to the necessity of finding liability by the "law of the place" there are Virginia cases which hold that Virginia courts will apply appropriate maritime law in cases within their jurisdiction dealing with maritime torts.[2]

■ Despite doubts as to the scope of the Tort Act, I have concluded, after considering all these Supreme Court cases construing it, that the plaintiff's complaint states a case within the jurisdiction of this court. The jurisdiction granted in sec-

tion 1346(b) is broadly stated to include "civil actions on claims against the United States, for money damages, * * * for injury or loss of property, or personal injury" etc., and for the reasons stated in United States v. Aetna Casualty & Surety Co., 338 U.S. 366, 383, 70 S.Ct. 207, 12 A.L.R.2d 444, the Act is to be construed liberally. Again, one of the overall purposes and inducing causes to the passage of the Act was to avoid as far as possible the multitude of private Acts of Congress granting consent to sue the United States for various torts allegedly committed by United States agents or agencies, including maritime torts as instanced by the case of United States v. Travis in this Circuit, 165 F.2d 546, 547. Even more significant is what was said in American Stevedores v. Porello, 330 U.S. 446, 453, 454, 67 S.Ct. 847, 851, 91 L.Ed. 1011. In that case a stevedore while working on a public vessel of the United States was injured by the alleged negligence of the ship's personnel. In the admiralty suit brought under the Public Vessels Act it was contended that the case was not within its coverage. In upholding the applicability of the Public Vessels Act it was said: "To hold now that the Public Vessels Act does not provide a remedy against the United States for personal injuries would in the future only throw this form of maritime action under the Federal Tort Claims Act; for that Act excepts from its coverage 'Any claim for which a remedy is provided by the Act * * * of March 3, 1925 (The Public Vessels Act) (U.S.C., title 46, §§ 781–790 inclusive [46 U.S.C.A. §§ 781–790] )'."[3]

■ While my conclusion on the principal point of law involved in the case is in favor of the plaintiff, I nevertheless have determined that the complaint must be dismissed on the facts because (1) I do not find there was negligence by the govern-

2. In Colonna Shipyard, Inc. v. Bland, 150 Va. 349, 143 S.E. 729, 59 A.L.R. 497; Colonna Shipyard, Inc. v. Dunn, 151 Va. 740, 145 S.E. 342, certiorari denied 279 U.S. 840, 49 S.Ct. 253, 73 L.Ed. 986.

3. In House Report No. 1523, 1948, U.S. Code Cong.Service 1900, referring to a

bill to extend admiralty jurisdiction, 46 U.S.C.A. § 740, it was said: "Now that the Tort Claims Act, 1946, has been enacted, however, jurisdiction of any claims for injuries excluded by interpretation from the Public Vessels Act will clearly fall within the Tort Claims Act."

ment agency in placement of the buoy marking the wreck of the Texas; and (2) I do find affirmatively that the proximate cause of the stranding of the plaintiff's boat was incompetent and defective navigation.

The plaintiff's complaint is based on alleged negligence of governmental agencies in placing the buoy too distant from the wreck which it marked. It alleges breaches of duty under the so-called Federal Wreck Statute, 33 U.S.C.A. § 409, which provides that when a wreck is sunk in a navigable channel the owner must immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and maintain such markers until the craft is removed or *abandoned*. Failure on the part of the owner to commence and prosecute removal diligently is considered as an abandonment of the craft and subjects the same to removal by the United States "as hereinafter provided for". Section 414 provides that whenever navigable water is obstructed by a sunken vessel and such obstruction has existed for more than 30 days or after abandonment the sunken obstruction "shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of War *at his discretion* \* \* \*." More recently by the Act of August 4, 1949, 14 U.S.C.A. § 86, it is provided that the Coast Guard may, for the protection of navigation, mark any sunken vessel when the owner has failed to do so in accordance with the provisions of section 409 of title 33; after abandonment of the sunken vessel "the Secretary of War (now the Army) shall keep the same so marked pending removal thereof in accordance with the provisions of section 414 of Title 33, but the Coast Guard may at the request of the Department of the Army continue the suitable marking of any such obstruction for and on behalf of that Department". It thus appears that the statutory duty or authority with respect to the marking or removal of wrecks after abandonment by the owner lies with the Secretary of War (Army) to be exercised at his *discretion*; while the temporary attention to marking is committed to the Coast Guard until the

Secretary decides. In practice the authority of the Secretary of War in this respect is by delegation, exercised by the Chief of Engineers; and also by administrative practice necessary current attention from time to time for the servicing, replacement, repair or restoration of buoys disturbed or damaged by storms, weather or use is given by the Coast Guard.

As more fully stated in the findings of fact, the wreck of the Texas had been marked by a buoy since it was first sunk in 1911. This buoy had at different times been placed at different distances from the wreck varying from 500 to 1500 feet or more. The existence of the wreck and its marking by a buoy in approximately the same location had been a well-known water mark for nearly forty years and had been duly noted on charts and in other sources of information for mariners. The Texas had been used for target practice first in 1911 for naval gunfire, later in 1921 for aerial bombardment and again in 1944 for further target practice. It was situated in an area of the Bay which had been set aside and marked as a danger zone and for target practice as authorized by 33 U.S.C.A. § 3, and regulations published in 33 C.F.R. § 204.46. The red portion of Tangier Sound Lighthouse illuminated the area constituting the danger zone as a red sector; while the white portion of the light covered adjacent area outside of the danger zone. Despite the subjecting of the Texas to target practice bombardment at least 200 linear feet of its superstructure was plainly visible above the water until 1940 and for some time thereafter, probably until 1944 at least, but in 1949 the whole superstructure was under water except at very low tide.

With respect to the adequacy of the buoy marking, it is to be noted that when the Lexington collided with the Texas in 1940, Judge Way found that it was due to faulty seamanship. And when a yacht in 1948 struck the Texas, again it was this time admittedly due to faulty navigation; but the owner of the yacht, being associated with the Coast Guard Auxiliary, made complaint to the Coast Guard to the effect that the wreck was not ade-

quately marked. As more fully outlined in the findings of fact, correspondence then ensued between the Coast Guard and the office of the Chief of Engineers which shows that at the request of the Engineers the Coast Guard made a field examination on the ground and stated its opinion that due to practical conditions of servicing of buoys the buoy was placed as near to the wreck as practicable although not so near as possible; that two lights, one on each side of the wreck, were not desirable or necessary and that if authorized by the Engineers and at the expense of the War Department, a fixed lighthouse could be built upon the wreck at a cost of about $30,000. As a result of the interdepartment correspondence the Chief of Engineers decided to do nothing further at that time. In this respect he exercised a discretion which I consider was clearly within the exception above referred to as section 2680(a).[4]

Counsel for the plaintiff has cited numerous cases in which under their respective particular facts parties have been held liable for defective marking of wrecks including some cases in which the defect existed in the fact that the buoy or other mark was placed too distant from the wreck. Particular reliance is placed on United States v. Travis, 4 Cir., 165 F.2d 546, where, in another location in the lower Chesapeake Bay in Virginia waters, the trial judge on the facts found for the plaintiff where the buoy was about 350 feet from the wreck. And again in the case of The Mary A. Bickel, 4 Cir., 46 F.2d 988, when the buoy was only 200 feet away from the wreck. It is, however, clear enough from the evidence in this case that the proper location of a buoy to mark a wreck depends upon many factors including particularly the width of the channel or seaway, the depth of the water, whether in open waters as in this case, the volume of vessel traffic and the probable effect of ice or storms on the buoy. The facts with respect to the proper location of the buoy in the instant case are different from the particular facts of other cases. The evidence of the Coast Guard officers who have had practical ex-

perience in the servicing of buoys satisfies me by more than a preponderance of the evidence that their opinion that the buoy was properly placed was a reasonable and correct exercise of judgment. From time to time buoys have to be serviced and replaced. They are subject to destruction or damage by extremely adverse weather conditions as was the case in the Baltimore Crisfield & Onancock Line v. United States, 140 F.2d 230. The tender which services the buoy is 180 feet long. It must necessarily have sufficient seaway in its servicing of the buoy especially with rough seas in open waters. Furthermore, the Texas itself is submerged under the water for at least 300 feet in length, and the buoy chain is 150 feet long. Under all these circumstances I find no negligence on the part of the Coast Guard or of the Secretary of War in having maintained the buoy where it was from 1936 until 1950, when, after the collision in this case, it was moved somewhat closer to the wreck, that is within 225 feet of the wreck, with the probable result that servicing of the buoy hereafter will be made more difficult or dangerous by reason of the re-location. Nor do I think that under the circumstances of this case the change in the location after the accident is indicative of prior negligence.

The plaintiff charges that the San Marcos wreck is a continuing public nuisance. In different facts and circumstances it might well be so; but in this case the charge is unfounded. The sinking of the Texas was not an unlawful act but resulted from governmental action exercised in the interest of national defense. The wreck was immediately marked with an adequate buoy to serve as a warning of danger to navigators. This buoy has existed for many years and for 14 years has been in the same place and has been indicated all that time on governmental charts published for the aid of navigation. For many years prior to 1944 about 200 feet of the superstructure of the wreck was well above the surface of the water. In 1944 during the last World War it was again used for aerial bombardment. Its existence, just as would

4. See Coates v. United States, 8th Cir., 181 F.2d 816; Sickman v. United States, 7 Cir., 184 F.2d 616.

be a reef or rocky ledge in other waters, has become well known especially to local watermen. Furthermore, it has been for years in a governmentally authorized and restricted danger zone under 33 U.S.C.A. § 3. The existence of this zone is also indicated to mariners by the illumination from the red sector light of the Tangier Sound Lighthouse, which is plainly visible under ordinary conditions to mariners of normal eyesight to a distance westerly of the buoy and the wreck. The question as to whether the wreck should be removed entirely or marked by a fixed lighthouse on the wreck in addition to the warning given by the buoy has been carefully considered by the Secretary of War acting through the Chief Engineer's office, and in the exercise of their discretion it was not deemed necessary or practicable to change or increase the warning given by the buoy. The buoy itself was of standard and approved type.

The Texas is an old target in an area which for years past has been and still is a target area with present continuing necessity for the testing of new types of explosives in the interest of national defense. Congress has specifically provided for the creation of such target areas by 33 U.S.C. A. § 3, and has authorized the Secretary of War, through the office of the Chief of Engineers, to publish regulations defining such an area and stating the restrictions as to the use thereof, which seem to be in an effort to balance the needs of national defense with those of the local fishermen. Such regulations for this particular area have been duly published in the 1949 edition of the Code of Federal Regulations, Vol. 33, § 204.46, at page 331.[5] With respect to such an area the federal servitude is paramount, Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; and the federal grant protects against claim of nuisance. Sound Marine & Machine Corp. v. Westchester County, 2 Cir., 100 F.2d 360, 363. The Virginia law recognizes this. City of Lynchburg v. Peters, 145 Va. 1, 133 S.E. 674. The cases cited by plaintiff's counsel in support of their claim as to the existence of a public nuisance involve very different situations. This target area is in a portion of the Bay which is not generally navigated except for local convenience by small vessels to or from Tangier Sound, some 5 miles to the east, while the main ship channel is 5 or 6 miles to the west.

■ Under the Torts Act any recovery of damages must be in accordance with the "law of the place", which, in this case, is the law of the State of Virginia. There is a sharp conflict of view between the parties as to what is the applicable Virginia law. There is no dispute that for torts other than maritime, the law of Virginia applies the well-known common law principles as to the effect of contributory negligence, the assumption of risk and limited duty owed to a bare licensee as distinct from invitees.[6] On the other hand, the plaintiff contends that where, as here, a maritime tort is involved, the Virginia court, to the extent that it has jurisdiction, applies the maritime law where the existence of contributory negligence does not, as at common law, bar all recovery, but results only in dividing the damages in collision cases.[7] I take the view that the plaintiff's contention on this point is correct because, as I understand the Virginia cases, that would be the

5. After defining the area by latitude and longitude the regulations proceed to state what vessels (those having a speed of greater than 5 knots) may use the areas and under what conditions. Among them section 3 provides that fishing, oystering, claming, crabbing and other aquatic activities are forbidden within the limits of the danger zone except that existing fishing structures licensed by the State of Virginia may be maintained provided the owners obtain written permits. Day and night firing may be conducted intermittently but when in progress there is to be adequate patrol by naval craft to prevent vessels from entering or remaining within the danger zone.

6. See as to contributory negligence Russell v. Kelly, 180 Va. 304, 23 S.E.2d 124; assumption of risk, Tiller v. Norfolk & W. Ry. Co., 190 Va. 605, 58 S.E.2d 45, 48; as to bare licensees, Raven Red Ash Coal Co. v. Griffith, 181 Va. 911, 27 S.E.2d 360.

7. See Colonna Shipyard v. Bland, 150 Va. 349, 143 S.E. 729, 59 A.L.R. 497; Colonna Shipyard v. Dunn, 151 Va. 740, 145 S.E. 342, certiorari denied 279 U.S. 840, 49 S.Ct. 253, 73 L.Ed. 986; Johnson v.

position of the Virginia court if the case were within its jurisdiction. But I regard the law on this point as unimportant here because, as already noted, I have concluded on the facts that the defendant was not negligent and that negligence and incompetent navigation by the plaintiff's agent was the proximate and sole cause of the collision.

As more fully stated in the findings of fact, the mate in sole charge of the boat at the time of the accident was not competent except for very simple and non-difficult navigation. He was not able to read or understand the chart or to lay out a course for the boat thereby. He also had less than normally good vision although I do not attribute much weight to this as it is not clear that it was of itself a material contributing cause of the accident. It was not prudent for the master of the ship to turn over sole charge of the ship to the mate at the time he did and for the several hours thereafter until, as he said, he told the mate to awaken him when they got to Tangier Light. Captain Anderson was 42 years of age and had had many years' experience in navigating small boats in the lower Chesapeake Bay. He had long been familiar with the San Marcos wreck having passed it before 1944 when its superstructure was still conspicuously above water. The buoy had been in the same place since 1936. He knew, of course, that the wreck was lying in water almost due north from the buoy and as he had seen the wreck when out of water and the buoy had not been moved thereafter, he must have known approximately the distance that the wreck did lie north of the buoy. He had shown the mate the location of the buoy on the chart and had told him to keep away from it or not to get too close to it. The mate himself had accompanied the boat on about 5 trips previous to the accident and had noted on at least one or more occasions that the boat passed to the south of the buoy. While the evidence

given by both Capt. Anderson and the mate Carter was in many respects unclear, one fact that is not open to reasonable dispute is that when, shortly before 2 A.M., the master turned over the steering of the boat to Carter, he clearly gave him instructions to keep the boat on the course that he, Anderson, had then laid out, which was northeast by east, and which course the master knew was the proper course to be followed until the boat reached Tangier Light when Carter was instructed to call the Captain to take over the voyage up the shallow Sound which Anderson evidently thought it important for himself to do; and which course, as Anderson stated as a witness, he knew would if pursued safely pass the buoy on the right, that is to the south of the buoy.

If these instructions had been followed by the mate the collision would not have occurred, because it also definitely appeared by another expert witness that the course northeast by east laid out by Anderson from the point at which he had given the wheel to Carter would, if followed, have made the boat bass the buoy at least half a mile to the south. There was also on the boat at the time a copy of the Coast Pilot which, for the voyage on which the boat was then engaged, suggested or recommended that the proper course in passing the buoy was to pass it about .9 of a mile to the south. The collision occurred because Carter did not follow the instructions given him by Capt. Anderson. As a witness Carter said in substance that as he was approaching the buoy at a distance of a mile or so to the southwest it was almost dead ahead and when he got closer to it he decided not to go to the south but to change the course from northeast by east to north by slightly west, thus passing the buoy at a distance of about 750 feet to the west, and then following this changed course for what he estimated to be a quarter of a mile when he again changed the course toward

Elliott, Inc., 152 Va. 121, 146 S.E. 298; Hagan v. City of Richmond, 104 Va. 723, 52 S.E. 385, 3 L.R.A.,N.S., 1120. See also Johnson v. United States, 9 Cir., 170 F.2d 767, and Johnson v. United States, 2 Cir., 168 F.2d 886, where in suits under the Act involving maritime torts the court did not make any choice between common law and the maritime law. See also South Carolina State Highway Dept. v. United States, D.C., 78 F.Supp. 594, 597, affirmed 4 Cir., 171 F.2d 893, and also State Road Department v. United States, D.C., 78 F.Supp. 278.

the east, as he indicated, to get back on his course, and immediately collided with the wreck.

The plaintiff contends that it was not negligence on Carter's part to pass the buoy to the left, that is to the west, instead of to the south. Attention is called to the fact that the color marking of the buoy was horizontal black and red stripes with a *red top,* and reference is made to 14 U.S.C.A. § 87 which provides with regard to the coloring and numbering of buoys that a buoy with red and black stripes may be passed on either hand; and the regulations, C.F.R. Vol. 33, p. 93, No. 62.25–5c provide "If the topmost band is red, the preferred channel will be followed by keeping the buoy on the starboard (right) hand." [8]

The parties differ in their interpretation of the phrase "preferred channel" in the context. Plaintiff contends that this regulation with respect to this buoy meant for the boat on its particular course at the time that the better way to pass the buoy was to the left or west; but I think it is made quite clear from the testimony of Commander Steele and Lt. Simmons of the Coast Guard that on the particular course of The Anderson it should have passed the buoy on the right or south. The reason for this is that the buoy is at the junction of cross-ways of boats going north toward Baltimore and boats going from west to east as was The Anderson. The main ship channel up the Chesapeake Bay is, of course, to the left or west of this buoy and that is the principal or preferred channel with respect to the significance of the buoy in a ship coming in through the Capes or up from Norfolk to Baltimore. But The Anderson was not on such a course but proceeding from west to east and intending to go up Tangier Sound. The channel for this latter voyage was not the main or principal channel at the

junction point but only a tributary one. And, as heretofore stated, the course laid out by Capt. Anderson for Carter to follow was to pass the buoy on the right or south. But I am not disposed to attach much importance to the difference between the parties in this respect because it does not appear that Carter's action was influenced by his understanding of the directional aids furnished by the buoy. Indeed so far as I recall from the evidence (not yet written up) it does not appear that he relied at all upon the marking of the buoy or that he even understood its significance. It may be noted that the published aids to navigation called the Coast Pilot, p. 64, recommends, on speaking of the course that The Anderson was following, that the buoy be passed .9 of a mile to the south. And a copy of this book was at the time on board The Anderson although it is said had never been read or consulted either by Capt. Anderson or by the mate.

The plaintiff submitted the testimony of several local watermen with experience in the navigation of small boats of this class in these waters, some of whom testified in effect that they would have regarded it as prudent to pass this buoy on either side at a distance of 750 feet, and that it was not customary for small boats of The Anderson class to equip themselves with charts and aids to navigation such as the Coast Pilot. Plaintiff's counsel further contends that it will be quite unreasonable to hold the navigators of such small craft responsible to the extent of the knowledge required of masters of much larger ships. But the argument has little application to the facts of this case. Small boats can, of course, by reason of their smaller draft and presumably better maneuverability navigate in closer waters and take greater chances than could larger boats in similar situations. And as their voyages are presumably customarily in local and familiar

8. The regulation relates to the significance of the color of buoys and provides that when proceeding from seaward (c) "Red and black horizontally banded buoys mark junctions or bifurcations in the channel, or wrecks or obstructions, which may be passed on either side. If the topmost band is black, the preferred channel will be followed by keeping the buoy on the port (left) hand. If the topmost band is red, the preferred channel will be followed by keeping the buoy on the starboard (right) hand. (Note: When proceeding toward seaward, it may not be possible to pass on either side of these buoys, and the chart should always be consulted.)"

areas they can at times reasonably take chances which would be obviously foolhardy for much larger ships. But in this case we are not concerned in any way with generally shallow waters or narrow channels but with the avoidance of a known underwater obstruction marked by a buoy. The plaintiff's case is based wholly on the proposition that the buoy was placed too far from this known obstruction. Carter, the mate, wrongfully supposed, without previous inquiry, that the buoy was practically over the wreck itself. Anderson, the Captain, to the contrary, had instructed Carter to keep a course which would have taken him safely far south of the buoy and the wreck. The mistake that Carter made was in changing the course contrary to instructions and this directly caused the disaster.

For these reasons I conclude that the complaint must be dismissed with costs. Counsel may present the appropriate order in due course.