SOMERSET SEAFOOD CO. v. UNITED STATES.

No. 6295.

United States Court of Appeals Fourth Circuit.

Argued Nov. 6, 1951.

Decided Dec. 19, 1951.

Donald D. Webster and John D. Alexander, Baltimore, Md. (Wm. Pepper Constable, Baltimore, Md., on the brief), for appellant.

Thomas F. McGovern, Sp. Asst. to the Atty. Gen. (Holmes Baldridge, Asst. Atty. Gen., Bernard J. Flynn, U. S. Atty., and James B. Murphy, Asst. U. S. Atty., Baltimore, Md., on the brief), for appellee.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and MOORE, District Judge.

DOBIE, Circuit Judge.

The Somerset Seafood Company (hereinafter called Somerset) filed a civil action in the United States District Court for the District of Maryland, under the Federal Tort Claims Act (hereinafter called the Act), seeking damages from the United States for the loss of Somerset's oyster boat, The T. H. Anderson, alleged to have been stranded on the wreck of The San Marcos (the old battleship Texas, renamed), which, in 1911, had been sunk by the United States in the navigable waters of Chesapeake Bay. The complaint alleged that the loss of The Anderson was due solely to the negligence of the United States in creating and marking the wreck of The San Marcos.

The District Court held that (1) the complaint stated a case within the Tort Claims Act under federal wreck-marking statutes; (2) that the maritime law as adopted by the State of Virginia, applying the rule of divided damages for contributory negligence was the "law of the place" under the Tort Claims Act; (3) that defendant in maintaining the wreck buoy approximately 525 feet from the nearest part of the 300 foot long wreck did not negligently mark it; (4) that the wreck was not a continuing nuisance; and (5) that the stranding was proximately caused by incompetent and defective navigation of the Mate of The Anderson who apparently avoided the buoy by 750 feet, and passed with the wreck buoy on his right hand.

The complaint was, accordingly, dismissed and Somerset has appealed. The opinion below is reported in D.C., 95 F. Supp. 298.

We think the District Judge correctly ruled that the complaint stated a case under the Act, though the question is not free of difficulty.

Here we are particularly concerned with Sections 1346, 2674, 2680 of the Act, all found in 28 U.S.C.A. Section 1346(b) provides that the federal District Courts "shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

The test of liability under the Act is thus prescribed in Section 2674: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

In Section 2680 are listed twelve classes of cases expressly excepted from the grant of jurisdiction under the Act, and we quote two of these excepted classes:

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not

such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

"(d) Any claim for which a remedy is provided by sections 741–752 (Suits in Admiralty Act), 781–790 (Public Vessels Act) of Title 46, relating to claims or suits in admiralty against the United States."

■ The contention of the United States that the case before us is not within the Act seems to stem primarily from § 2680(d) just quoted above, which, we are told, evidenced an intent on the part of Congress to except from the Act all maritime torts which might be made the basis for a suit in admiralty. With this we cannot agree, and we think it is necessary to add little to what was said by the District Judge.

The instant action was not brought, and could not be brought, under either the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., or the Public Vessels Act, 46 U.S. C.A. § 781 et seq. The exceptions in § 2680(d) of the Act are expressly limited to claims under the Suits in Admiralty Act and the Public Vessels Act. It seems crystal clear, as the District Judge pointed out, that the two Acts just mentioned fall far short of covering the whole field of maritime torts. See, United States v. Spelar, 338 U.S. 217, 220, Notes 6, 9, 70 S.Ct. 10, 94 L.Ed. 3; Baltimore, Crisfield & Onancock Line, Inc., v. United States, 4 Cir., 140 F. 2d 230; Corby v. Ramsdell, 2 Cir., 48 F.2d 701; State of Maryland, to use of Pryor, v. Miller, 4 Cir., 194 F. 775.

■ We are not impressed by the scattered remarks of some members of Congress, found in the Congressional Record, that the legislative intent was to include within the ambit of the Act only common law torts and to exclude all maritime torts. The Act must be given a liberal construction to ward off the obvious evil which the Act was passed to prevent—the cumbersome and unwieldy practice of seeking relief in Congress by private bills. The jurisdiction granted to the federal District Courts by

§ 1346(b) of the Act is couched in quite broad and very expansive language. See, United States v. Aetna Casualty & Surety Co., 338 U.S. 366, 383, 70 S.Ct. 207, 94 L.Ed. 171; American Stevedores v. Porello, 330 U.S. 446, 453, 67 S.Ct. 847, 91 L.Ed. 1011; United States v. Travis, 4 Cir., 165 F.2d 546, 547.

We find no merit in the contention that the United States is relieved of liability by virtue of §§ 1346(b) and 2674 of the Act. By § 1346(b) liability is imposed "under circumstances where the United States, if a private person, would be liable"; while § 2674 reads: "The United States shall be liable * * * in the same manner and to the same extent as a private individual under like circumstances".

■ The initial duty of removing or marking a wrecked ship rests upon the owner until abandonment of the ship. After abandonment, this duty clearly rests on the United States under the Wreck Acts, 33 U.S.C.A. §§ 409, 736, 14 U.S.C.A. § 86, in substitution for the initial activity required of the individual owner. Here, the United States was the original owner of The San Marcos, before its abandonment.

There is nothing in the celebrated case of Feres-Jefferson-Griggs v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, which militates against our conclusion, which was also that of the District Judge. All that case really decided was "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries [arose] out of or are in the course of activity incident to service." 340 U.S. at page 146, 71 S.Ct. at page 159. Mr. Justice Jackson in his opinion 340 U.S. at page 139, 71 S.Ct. at page 156, remarked: "The Tort Claims Act was not an isolated and spontaneous flash of congressional generosity. It marks the culmination of a long effort to mitigate unjust consequences of sovereign immunity from suit." See, also, Cerri v. United States, D.C., 80 F.Supp. 831; Moran v. United States, D.C., 102 F.Supp. 275. Cf. United States v. Travis, 4 Cir., 165 F.2d 546; Baltimore, Crisfield & Onancock Line, Inc. v. United States, 4 Cir., 140 F.2d

230; The Mary A. Bickel, 4 Cir., 46 F.2d 988; Gilbert v. Trinity House, 1886, 17 Q.B.D. 795; Jolliffe v. The Wallasay Local Board, 1873, L.R. 9 C.P. 62.

It is suggested that it was not intended to impose liability on the United States for damages arising out of the exercise of what are essentially "governmental" functions as distinguished from those which might be carried on by private individuals, but we think that there is no basis for such distinction. As was said by Judge Roche in Cerri v. United States, D.C.N.D.Cal., 80 F.Supp. 831, 833: "The defense that this act does not apply to those cases wherein the negligence occurred during the exercise of a sovereign power of the United States, if heeded, would create a twilight zone of governmental activities in which the consent given by this statute could not be applied. Too numerous are the affairs of a purely governmental or sovereign nature, prohibited to or not duplicated by the activities of private individuals, to consider this to be the intent of Congress. Certainly, the statute itself makes no distinction between governmental activities of a sovereign nature and those of a proprietary nature, nor does it include within the claims exempted, 28 U.S.C.A. § 943 (under revision of 1948, 28 U.S.C.A. § 2680), those of this type."

The case is favorably discussed by Judge Yankwich in 9 F.R.D. 143, at page 156 where he says: "In this respect, the opinion accords with the latest decisions of the Supreme Court which do not recognize in the law of public liability of the United States the distinction between governmental and other capacities. This was put very pithily by Mr. Justice Frankfurter in a well-known case: 'Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it.' Federal Crop Ins. Corp. v. Merrill, 1947, 332 U.S. 380, 383, 68 S.Ct. 1, 92 L.Ed. 10." And in Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 391, 59 S.Ct. 516, 518, 83 L.Ed. 784, the Supreme Court, in holding that a governmental corporation's liability to suit is not to be inferred from whether it is or is not doing the government's work, said: "Congress has provided for not less than forty of such corporations discharging governmental functions, and without exception the authority to-sue-and-be-sued was included. Such a firm practice is partly an indication of the present climate of opinion which has brought governmental immunity from suit into disfavor, partly it reveals a definite attitude on the part of Congress which should be given hospitable scope."

We think, too, that the Wreck Acts effectively dispose of the contention that the United States is relieved of liability here because, under § 2680(a) of the Act, the Government is not liable for the breach of a discretionary duty and that the Government's duty here to remove or mark the wreck was discretionary. As we read the Wreck Acts, the duty of the United States to mark or remove the wreck is mandatory. The appropriate federal agencies and officers decide merely the proper methods or measures.

In addition to this, we think that, even if the decision to mark or remove the wreck be regarded as discretionary, there is liability for negligence in marking after the discretion has been exercised and the decision to mark has been made. There is certainly no discretion to mark a wreck in such way as to constitute a trap for the ignorant or unwary rather than a warning of danger. See Johnston v. District of Columbia, 118 U.S. 19, 6 S.Ct. 923, 30 L.Ed. 75; Costley v. United States, 5 Cir., 181 F.2d 723; Toledo v. United States, D.C., 95 F. Supp. 838; Dishman v. United States, D.C., 93 F.Supp. 567, 571. As said by Judge Chesnut in the case last cited: "This exception is not applicable here. This is not a case in which in the exercise of discretion or judgment the officials of the Veterans Hospital declined to give the plaintiff treatment, but it is a case where having exercised their discretion to give the treatment, in accordance with the applicable regulations, the treatment given was negligent."

The District Judge concluded affirmatively "the proximate cause of the stranding of plaintiff's boat was incompetent and defective navigation." We quote from the District Judge's findings of fact numbers 13, 16 and 17:

"13. There is plenty of water for small vessels to give the wreck adequate sea room; and prudent mariners pass the wreck with ½ mile to a mile clearance. The course given by the captain of the T. H. Anderson to his mate would have passed the wreck to the southerly a considerable distance off the wreck."

"16. The mate, Lennie Carter, is a young colored man about 25 years old who resided at the hailing port of the vessel, Deal Island, Maryland, all his life. For some years past he had had seasonal occupation on boats and had from time to time been employed by the plaintiff for that service. He had had only a limited education, was not a licensed pilot, and his evidence in the case as a witness quite clearly showed that though doubtless well intentioned he was not a competent navigator and could probably have been trusted to navigate even a small boat such as the Anderson only under very simple and not difficult or dangerous conditions. He had been employed on the Anderson for some little time prior to the accident and on occasions had been permitted to steer the boat; but he was not competent to read or understand the chart or to lay out a proper course to be steered. His vision was not good owing to the fact that he was cross-eyed and had been rejected for the Army in 1943 by reason of defective eyesight. He would not have been able to qualify for an able bodied seaman's certificate. Jabez Webster, the other crew member, had adequate vision."

"17. * * * The mate, Lennie Carter, had accompanied (Captain) Anderson on the boat for about 5 trips during the 1949 season before the collision. Anderson had told Carter about the wreck and not to keep close to it. He had also shown Carter the location of the buoy on the chart. On one or more occasions in 1949 when Carter was on the boat it had passed the buoy a good distance to the south. When he turned the wheel over to mate Carter about 2.00 A.M. and about 10 miles from the buoy, he told Carter to keep the boat on the course which he had then laid out which was northeast by east, and which course if kept and pursued would have taken the Anderson at least half a mile southerly from the buoy which would thus have been passed by the Anderson on her port side."

Mate Carter testified that he passed the buoy on the righthand side, never coming closer than 750 feet to the buoy. There is ample evidence to sustain this conclusion and these findings, with which we agree.

We cannot agree, however, with the District Judge's conclusion that the United States was free from negligence. We think the sinking of The Anderson was due both to the negligence of the United States and to the faulty navigation of The Anderson.

When The San Marcos was first sunk, in 1911, a considerable part of the vessel projected above the surface of the water. For some time prior to The Anderson accident, however, only a small part of the vessel was visible and then only at very low tide. At least two other boats, The Fay Ray and The Lexington, had run on the submerged wreck before The Anderson. There is constant navigation on Chesapeake Bay.

There had been no little correspondence between the Coast Guard and the Corps of Engineers concerning the propriety of the marking of the wreck. In one letter, dated February 18, 1949, the Commandant, Coast Guard Headquarters, Washington, advised the Chief of Engineers that it would cost about $30,000. to erect a lighthouse on the wreck in place of the buoy and that the Coast Guard would do the work on a reimbursable basis. This letter contained the following sentence: "The effectiveness of this and (the bell buoy) could probably be increased if the buoy were placed closer to the wreck." In a letter from Lt. Colonel Welling, Corps of Engineers, to the Chief of Engineers, it is stated: "The wreck of the San Marcos is considered a menace to navigation." The Chief of Engineers, however, decided against the erection of the lighthouse. Several complaints had been made to the federal authorities to the effect that the submerged San Marcos was a danger to navigation and recommending that

steps be taken to guard against this danger. A letter from Lt. Colonel Jewett, Corps of Engineers, to the Commandant of the Coast Guard, stated: "The wreck was discussed with several local vessel operators and they are of the opinion that it is hazardous to navigation particularly in foggy and inclement weather."

The final decision not to move the buoy, before the sinking of The Anderson, and the reason for that decision, are found in a letter from the Commander, 5th Coast Guard District at Norfolk, to the Commandant of the Coast Guard: "While it is possible to place the buoy in question closer to the wreck, this action is not deemed practicable due to the added danger created in connection with tenders servicing the aid."

This buoy seems to have been, at the time of the sinking of The Anderson, about 525 feet from the nearest point of the submerged San Marcos, which was about 300 feet long. In spite of the statements just quoted as to the impracticability of moving the buoy closer to the wreck, The Mistletoe, after The Anderson sinking, moved this buoy to a position only 225 feet from The San Marcos, and shortened the mooring chain of the buoy from 150 feet to 90 feet. Pertinent in this connection is Baltimore & P. R. Co. v. Cumberland, 176 U.S. 232, 20 S.Ct. 380, 381, 44 L.Ed. 447. Defendant's testimony in this crossing injury case was that "it was impracticable to build a fence * * * consistently with the proper management of the road." One was built afterwards. Of this, the Court said, 176 U.S. at page 236, 20 S.Ct. at page 381: "As bearing upon the practicability of a fence * * * it is pertinent to note that, after the accident occurred, a fence was erected". See, also, State of Maryland for use of Pumphrey v. Manor Real Estate & Trust Co., 4 Cir., 176 F.2d 414; E. M. Millard, The, D.C., 285 F. 94, 95; Franklin v. Webber, 93 Or. 151, 182 P. 819; Koskoff v. Goldman, 86 Conn. 415, 85 A. 588.

The San Marcos wreck buoy is Light No. 1892 in the Light List; Atlantic and Gulf Coast, 1949. Its location is given as 37° 43. 1 N, 76° 04.8 W. The light is 12 feet above the water and shows an interrupted, quick flashing white light and has a bell. It is marked with red and black horizontal bands, with red top. The buoy is marked on U. S. C. & G. S. Chart No. 1223. The buoy extended 16 feet below the water and was moored to an iron sinked weighing 5,000 pounds. We do not hesitate to state that, under a close case, in the balancing of the two social interests here involved—the convenience of the Coast Guard in servicing the buoy and the safety of maritime navigation—we strongly favor the latter.

The District Judge stated in his opinion [95 F.Supp. 308]: "Counsel for the plaintiff has cited numerous cases in which under their respective particular facts parties have been held liable for defective marking of wrecks including some cases in which the defect existed in the fact that the buoy or other mark was placed too distant from the wreck. Particular reliance is placed on United States v. Travis, 4 Cir., 165 F.2d 546, where, in another location in the lower Chesapeake Bay in Virginia waters, the trial judge on the facts found for the plaintiff where the buoy was about 350 feet from the wreck. And again in the case of The Mary A. Bickel, 4 Cir., 46 F.2d 988, when the buoy was only 200 feet away from the wreck. It is, however, clear enough from the evidence in this case that the proper location of a buoy to mark a wreck depends upon many factors including particularly the width of the channel or seaway, the depth of the water, whether in open waters as in this case, the volume of vessel traffic and the probable effect of ice or storms on the buoy. The facts with respect to the proper location of the buoy in the instant case are different from the particular facts of other cases."

There is unquestioned force in the District Judge's remark: "the proper location of a buoy depends upon many factors". Each case, as it arises, must be decided on the particular set of facts therein involved. Yet we think that the principles set out by our court in the Travis and Bickel cases, when applied to the facts of the instant case, require the conclusions that the United States was negligent in marking the wreck of The San Marcos, and that this

negligence contributed to the sinking of The Anderson.

■ One further question remains: what is the "law of the place", which under the Act controls liability here, and what are the pertinent and applicable provisions of that law. This question becomes important here by virtue of our holding that both The Anderson and the United States were guilty of negligence contributing to the sinking of The Anderson. If the ordinary rules of the common law be applied, the contributory negligence of plaintiff is a complete defense; but, if the admiralty law is applied, the damages here will be divided.

The District Judge declared:

"And with respect to the necessity of finding liability by the 'law of the place' there are Virginia cases which hold that Virginia courts will apply appropriate maritime law in cases within their jurisdiction dealing with maritime torts.*

"*In Colonna Shipyard, Inc. v. Bland, 150 Va. 349, 143 S.E. 729, 59 A.L.R. 497; Colonna Shipyard, Inc. v. Dunn, 151 Va. 740, 145 S.E. 342, certiorari denied 279 U. S. 840, 49 S.Ct. 253, 73 L.Ed. 986." [95 F. Supp. 306.]

With this we agree, though the question is not free from doubt, so the damages must be divided.

Against this, the United States cited the early Virginia case of Union Steamship Co. v. Nottinghams, 1866, 17 Grat. 115, 58 Va. 115. In that case, purely as a dictum, 17 Grat. at page 123, Judge Joynes, speaking for unanimous court, said: "The case being thus disposed of, it is unnecessary to consider whether there was any negligence on the part of those in charge of the schooner, or to discuss the principles applicable to the case of damage resulting from the mutual and concurrent fault of both parties. It is proper to say, however, that the admiralty rule adopted by the court below, by which the loss in such a case is divided equally between the parties, does not prevail in the courts of common law, and is inconsistent with common law principles. When the negligence or fault of the injured vessel contributes to produce the injury, so that the injury results directly from the negligence or fault of both vessels, the common law does not undertake to say how much of it is due to one and how much to the other, and leaves the loss where it falls." We think, however, that this dictum has been effectively overruled by Colonna Shipyard v. Bland, 150 Va. 349, 143 S.E. 729. In that case, (though oddly enough the Union Steamship case was not mentioned) Judge Prentis said, 150 Va. at page 358, 143 S.E. at page 731:

"(5) When one suffers an injury under such circumstances as to be a maritime tort, his rights are fixed by the admiralty law; but he may choose the forum in which to assert those rights. He has his remedy at common law, but his recovery and the precise relief to be afforded him are determined by the admiralty law which is applied, whether he sues in the common law or the admiralty court. He may pursue his remedy at common law in the state court, but that court must administer the admiralty law. He may select his court, but cannot add to or change his rights or the defendant's rights which are the same in both forums.

"(6) The trial court, in this case, observed this rule, refused to instruct the jury that contributory negligence would be an absolute bar to the action, but instructed them, on the contrary, in accordance with the admiralty rule, that if they believed from the evidence that the injuries received by the plaintiff were the result of negligence on the part of both the plaintiff and the defendants, they should apportion the loss against both the plaintiff and the defendants, and that such negligence on the part of the plaintiff should mitigate the damages which they would otherwise find for the plaintiff.

"This was the correct instruction to be given in this case, and the first assignment of error is not well taken."

This holding was expressly affirmed in Colonna Shipyard v. Dunn, 151 Va. 740, 145 S.E. 342, certiorari denied 279 U.S. 840, 49 S.Ct. 253. See, also, Johnson v. G.

T. Elliott, 152 Va. 121, 146 S.E. 298, which again cited and approved the Bland and Dunn cases. Cf. Hagan v. Richmond, 104 Va. 723, 52 S.E. 385, 3 L.R.A.,N.S, 1120; Colonna v. Bland, supra, was cited with approval in United States v. Norfolk-Berkley Bridge Corp., D.C.E.D.Va., 29 F.2d 115, 129 and in Garrett v. Moore-McCormack Co., 317 U.S. 239, 244, Note 8, 63 S.Ct. 246, 87 L.Ed. 239, and in Intagliata v. Shipowners & Merchants Towboat Co., 26 Cal.2d 365, 159 P.2d 1. And, in the Garrett case, supra, Mr. Justice Black, 317 U.S. at page 243, 63 S.Ct. at page 250, said: "There is no dearth of example of the obligation on law courts which attempt to enforce substantive rights arising from admiralty law to do so in a manner conforming to admiralty practice." Cf. Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L. Ed. 1086.

See further Seas Shipping Co., Inc., v. Sieracki, 328 U.S. 85, 88, 66 S.Ct. 872, 874, 90 L.Ed. 1099, where the Court said: "* * * It is now well settled that a right peculiar to the law of admiralty may be enforced either by a suit in admiralty or by one on the law side of the court * * *."

In Abbattista v. United States, D.C.N.J., 95 F.Supp. 679, 681, the Court adverted to the rule that whether the action was in admiralty or on the law side under the Tort Claims Act "the law of admiralty may be enforced," citing the Seas Shipping Co., Inc. case, supra. Recently in Jansson v. Swedish American Line, 1 Cir., 185 F.2d 212, 216, Circuit Judge Magruder said: "We take it now to be established by an impressive body of precedent that when a common law action is brought, whether in a state or in a federal court, to enforce a cause of action cognizable in admiralty, the substantive law to be applied is the same as would be applied by an admiralty court".

In State Road Department v. United States, D.C.Fla.1948, 78 F.Supp. 278, when sued for damage to a bridge, the Government counterclaimed for damages to its vessel. Admiralty law was applied without discussion as to whether the state had adopted it. In applying admiralty law, the court said, 78 F.Supp. at page 280:

"* * * Defendant's right to recover on its counterclaim in this case is controlled entirely by Admiralty law and the contention that parties plaintiff and defendant are not entitled to the benefit and protection given them under Admiralty law in untenable. The issues raised by the pleadings in this counterclaim will be tried and determined as though this case was in fact pending in Admiralty."

In Moran v. United States, D.C.1951, 102 F.Supp. 275, 277, District Judge Hincks stated: "The broad language of the Act precludes the narrow construction which the government now advances. When the Act specified that the liability of the government shall be determined 'in accordance with the law of the place where the act or omission occurred' clear intent was expressed to waive immunity irrespective of the place of the tort. It is significant that the applicable law was not stated to be the law of the State or territory: instead the language used was broad enough to include the maritime law which, of course, is the law of the place applicable to maritime torts."

The United States insists that when both plaintiff and defendant are guilty of contributory negligence in a maritime tort, there can be no recovery. Primary reliance is placed upon the statement of Chief Justice Fuller in the oft-tried and frequently quoted case of Belden v. Chase, 150 U.S. 674, 691, 14 S.Ct. 264, 269, 37 L.Ed. 1218:

"The doctrine in admiralty of an equal division of damages in the case of a collision between two vessels, when both are in fault contributing to the collision, has long prevailed in England and this country. The Max Morris, 137 U.S. 1, 11 S.Ct. 29 [34 L.Ed. 586]. But at common law the general rule is that, if both vessels are culpable in respect of faults operating directly and immediately to produce the collision, neither can recover damages for injuries so caused. Atlee v. Packet Co., 21 Wall. 389 [88 U.S. 389, 22 L.Ed. 619].

"In order to maintain his action, the plaintiff was obliged to establish the negligence of the defendant, and that such negligence was the sole cause of the injury, or, in other words, he could not recover,

though defendant were negligent, if it appeared that his own negligence directly contributed to the result complained of."

See, also, Wolker v. Electric Ferries, 2 Cir., 82 F.2d 1023, certiorari denied 299 U.S. 540, 57 S.Ct. 22, 81 L.Ed. 397, In re Pennsylvania Railroad Co., 2 Cir., 48 F. 2d 599, certiorari denied 284 U.S. 640, 52 S.Ct. 21, 76 L.Ed. 544; Puget Sound Navigation v. Nelson, 9 Cir., 41 F.2d 356; Sprague on Divided Damages, 1928, 6 N. Y.U.L.Q., 15; Derby on Divided Damages, 1947, 33 Va.L.Rev. 289; Griffin on Collision, 1949, § 252; Robinson on Admiralty, 859–864; Hearings before House Judiciary Committee, 77th. Cong. 2d Sess. on H.R. 5373 and H.R. 6463, pages 26, 27.

The Government's brief concludes with the statement that we cannot in our case apply the admiralty rule of divided damages "unless this court is prepared to overrule Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218, and to further hold that the courts of Virginia would not follow Union Steamship Co. v. Nottinghams, 17 Gratt 115, 58 Va. 115."

We have doubts whether Belden v. Chase is, or ought to be, the law; and it may well be (as the Government contends) that in a suit at law on a maritime tort in the federal District Court, under the diversity of citizenship jurisdiction, Belden v. Chase will be followed. But, to apply the admiralty rule of divided damages in the case before us, we need not overrule Belden v. Chase.

The Act specifically makes the "law of the place" controlling. Here, the "law of the place" is the *lex loci delicti*, the law of Virginia. We have no hesitation in holding that the dictum of Judge Joynes in the Union Steamship case was overruled by Colonna v. Bland and subsequent cases. We, accordingly, under the Virginia law, apply the admiralty rule of divided damages.

The judgment of the District Court is reversed and the case is remanded to that court with instructions to hold both the plaintiff, Somerset, and the defendant, United States, guilty of negligence con-

tributing to the sinking of The Anderson, to assess the damages, and to divide these damages between the plaintiff and the defendant.

Reversed and remanded.