Luther W. WHITE, III, Administrator, C.T.A. of the Estate of Donald E. Meeks, Appellant,

v.

UNITED STATES of America, Appellee.

No. 8823.

United States Court of Appeals Fourth Circuit.

Argued Jan. 15, 1963.

Decided April 22, 1963.

George H. Gray, Norfolk, Va. (Outland & Gray, Norfolk, Va., on brief), for appellant.

Howard E. Shapiro, Attorney, Department of Justice (Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Claude V. Spratley, Jr., U. S. Atty., and Sherman L. Cohn, Attorney, Department of Justice, on brief), for appellee.

Before BRYAN and J. SPENCER BELL, Circuit Judges, and CRAVEN, District Judge.

J. SPENCER BELL, Circuit Judge.

Suit under the Tort Claims Act for death of plaintiff's intestate, one Donald E. Meeks, a veteran who died after being hit by a train while under treatment for mental illness at the Roanoke Veterans Administration Hospital at Salem, Virginia. Invoking the Virginia Wrongful Death Act, the Administrator charges that employees at the hospital failed to exercise the degree of care for the veteran's safety appropriate for his mental condition. In its answer the United States denied negligence and also set forth two affirmative defenses. The first of the affirmative defenses was that the complaint failed to state a claim upon which relief could be granted because of the Virginia charitable immunity law. The second was the discretionary function exemption of the Tort Claims Act, 28 U.S.C.A. § 2680(a).

Pursuant to a pre-trial order the affirmative defenses were brought on for a separate hearing. In support of its discretionary function defense the Govern-

ment presented the testimony of four doctors from the hospital who were familiar with the case. The facts upon which the District Court based its decision on the merits of the case were developed from this testimony.

The District Court entered summary judgment [1] on three grounds: first, that the Veterans Hospital is a charitable institution and, therefore, not liable under the applicable Virginia law for the negligence of its employees; second, that any negligence charged comes within the discretionary function exemption of the Tort Claims Act; and third, that the evidence produced at the pre-trial hearing showed that there was no genuine issue as to any material fact and that the United States was entitled to judgment thereon as a matter of law. We must disagree with the Court on all three grounds.

The Roanoke Veterans Hospital is devoted predominantly to the care of psychiatric cases. It handles approximately 1,900 cases under the care of twenty-five doctors. Mental patients at the hospital are classified with respect to their freedom of movement in four categories: (1) privileged, (2) partially privileged, (3) locked ward, and (4) locked ward, observation status. Privileged patients are granted free access of the hospital grounds. Except for a ward visit in the morning, a bed check at night, meals, and certain work assignments, they are free to come and go as they please. Partially privileged patients are allowed to be "on their own" during certain periods of the day. Locked ward patients are confined to their wards. Locked ward, observation status patients are in addition kept in sight of hospital aides or nurses at all times. Upon admission to the hospital patients are placed in locked ward status until classified by staff doctors after consultation. However, a patient may be transferred from privileged status to locked ward or locked ward, observation status at any time by any staff physician acting pursuant to his own decision if the doctor is concerned that the patient might harm himself or injure others.

The policy expressed in the Veterans Administration regulations is to allow each psychiatric patient the maximum independence that his condition permits. On April 22, 1959, plaintiff's intestate was hospitalized for the fifth time since July of 1948. On August 10, 1959, he was released for a trial visit to his brother's home but he became disturbed and was admitted to Kecoughtan Hospital, Kecoughtan, Virginia. On August 27, 1959, he was transferred to the Roanoke hospital. No suicidal tendencies were observed in him by the admitting physician, but two days after his arrival, while still in locked ward status, he made remarks which a nurse interpreted to mean that he might harm himself, and he himself requested that he be anchored to his bed and placed in restraining cuffs. The physician on duty ordered him placed in observation status, where he remained until September 10th. On September 15 he was transferred to privileged status following a decision by a two man panel of doctors.

Many years before his current hospitalization Meeks had displayed suicidal tendencies. At the age of seventeen he had attempted to commit suicide in the presence of his brother. During his military service he made three other suicide gestures, once by taking an overdose of aspirin, once by jumping over the side of a ship, and once by an attempt with a firearm. There appears to be some professional doubt as to whether these acts were gestures or real attempts at suicide. At the time he was killed Meeks had been under treatment in privileged status for three weeks. He was receiving Thorazine, a tranquilizer. The day before, Friday, October 9th, Meeks called upon Dr. Parks, the staff physician in charge of his ward, complaining that he felt tense and uneasy and expressing fears that he might be drifting back into the condition that he was in when he came to the hospital—the condition which caus-

---

1. The Court's opinion is recorded in D.C., 205 F.Supp. 662.

ed him to request that he be anchored to the bed and placed in restraining cuffs. It was admitted by Dr. Parks that he was not then familiar with Meeks' suicidal attempts before his hospitalization or with the fact that Meeks had requested that he be restrained during the previous August. The doctor testified that Meeks did not in his opinion exhibit suicidal tendencies and that he did not feel it necessary to cancel his privileged status; instead he prescribed an additional dose of tranquilizer.

The last physician to see Meeks alive was Dr. Crowgey, who, though not a psychiatrist, was serving as officer of the day at the hospital on that Saturday, October 10th. That morning Meeks again complained of apprehension and nervousness. After talking with him Dr. Crowgey enlarged the tranquilizer dose Meeks was receiving. Meeks did not appear to the doctor to exhibit suicidal tendencies. Later that day upon the basis of a report by a nurse that Meeks was still nervous, the doctor ordered administration of sodium luminal, a sedative. Apparently, neither Dr. Parks nor Dr. Crowgey was familiar with the details of the patient's medical record which was in the hospital files. Meeks was found outside the grounds on the railroad tracks later that day, dead from injuries suffered when he was struck by a train.

■ The Government here expressly withdraws the defense of charitable immunity asserted in its answer, conceding that veterans' benefits, including hospitalization, represent a congressional purpose to reward and to provide necessary care to those who have served faithfully in the armed forces. While gratuities, they are not charity within Virginia's doctrine of immunity from tort liability for charitable institutions. Fulmer v. United States, 133 F.Supp. 775 (D.C. Neb.1955); Grigalauskas v. United States, 103 F.Supp. 543 (D.C.Mass. 1951), affirmed, 195 F.2d 494 (1 Cir., 1952); Dishman v. United States, 93 F. Supp. 567, 570 (D.C.Md.1950). We agree that the recipients of such services are not to be considered the recipients of charity within the terms of the charitable immunity doctrine, especially in view of the fact that the availability of medical care to veterans and their dependents has long been held out as an inducement to service in the armed forces.

This Court earlier placed itself on the side of a liberal interpretation of the Tort Claims Act in Somerset Seafood Company v. United States, 193 F.2d 631 (4 Cir., 1951). Judge Dobie pointed out that the Tort Claims Act was not an isolated and spontaneous flash of congressional generosity, but rather it marked the culmination of a long effort to mitigate the unjust consequences of sovereign immunity from suit. In that case the Court reached the conclusion that "The Act must be given a liberal construction to ward off the obvious evil which the Act was passed to prevent— the cumbersome and unwieldy practice of seeking relief in Congress by private bills". See also Dalehite v. United States, 346 U.S. 15, 24–25, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

■ We now come to the question of the applicability of the discretionary function exemption provisions of the Act.[2] The Tort Claims Act does not define "discretionary function", and each case must be measured against the broad spectrum of administrative power which ranges from the establishment of programs, issuance of regulations, and the granting of licenses to narrow decisions where administrative discretion stops and liability in tort begins. Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In Somerset Seafood

2. 28 U.S.C.A. § 2680(a) provides:
 "The provisions of this chapter and section 1346(b) of this title shall not apply to—
 "(a) Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

 **17**

Co. v. United States, 193 F.2d 631 (4 Cir., 1951), this Court reversed a judgment of the District Court and held the Government liable for the negligent marking of a wrecked vessel which resulted in damage to the plaintiff's ship. In speaking of the discretionary function exemption the Court said:

"In addition to this, we think that, even if the decision to mark or remove the wreck be regarded as discretionary, there is liability for negligence in marking after the discretion has been exercised and the decision to mark has been made." 193 F.2d at page 635.

See also Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L. Ed. 48 (1955); Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L. Ed.2d 354 (1957).

██ The Government contends that the decision as to the degree of freedom allowed Meeks was a discretionary function, in the exercise of which it is exempted from tort liability and it seeks to bring this case within the aegis of those cases holding that the decision to extend or terminate medical services to an individual is a discretionary function and, therefore, exempt. With this contention we cannot agree. While the policy embodied in the Veterans Administration Regulations that patients should be allowed the maximum of freedom warranted by their condition is a discretionary decision, the application of that policy to an individual case is not within the category of policy decisions exempted by the statute. The application of that policy to the individual case is an administrative decision at the operational level which if negligently done will make the Government liable—whether it involves substandard professional conduct (malpractice) or simple negligence in custodial care. None of the cases cited by the Government holds otherwise. In United States v. Gray, 199 F.2d 239 (10 Cir., 1952) the insane wife of an enlisted man had been accepted for treatment in an army general hospital. During a time when the doctors and her guard left her unattended, she jumped from a window, injuring herself. The Government pleaded the discretionary function exemption, arguing that the Government had accepted the patient in a general hospital which was ill equipped for her case until she could be transferred. The Court said that once having extended its services, the Government was liable for negligence in the care of its patients. In Costley v. United States, 181 F.2d 723 (5 Cir., 1950) the Court held the discretionary function defense unavailable where a patient was injected with the wrong substance during childbirth. Dugan v. United States, 147 F.Supp. 674 (D.D.C.1956), cited by the Government, is not persuading. In that case a pre-frontal lobotomy patient at St. Elizabeth's Hospital abruptly assaulted and killed another patient. While the Court stated that the determination of where patients were to be detained and what provisions were to be made for their supervision was a discretionary function of the doctors and officers of the hospital within § 2680(a), the Court nevertheless stated that there was no evidence whatsoever of negligence on the part of the staff in allowing the assaulting patient his freedom as he had shown no signs of or tendency towards violence since his operation.

In Dishman v. United States, 93 F. Supp. 567 (D.C.Md.1950) the plaintiff brought suit under the Tort Claims Act for personal injuries sustained when a doctor employee of a Veterans Administration hospital erroneously poured carbolic acid in his ear. The District Court gave judgment for the plaintiff. Judge Chesnut, speaking of the question of discretionary exemption, said:

"This exception is not applicable here. This is not a case in which in the exercise of discretion or judgment the officials of the Veterans Hospital declined to give the plaintiff treatment, but it is a case where having exercised their discretion to give the treatment, in accordance with the applicable regulations, the treatment given was negligent."

This passage was quoted with approval by Judge Dobie in the Seafood case, supra.

We think the cases involving the decision of whether to extend services to an individual are distinguishable on principle from the instant case. The Fifth Circuit so distinguished its decision in Costley v. United States, 181 F.2d 723 (5 Cir., 1950) from Denny v. United States, 171 F.2d 365 (5 Cir., 1948), Cert. denied, 337 U.S. 919, 69 S.Ct. 1161, 93 L.Ed. 1728 (1949). We find no case in which the courts have attempted to distinguish between negligent custodial care and malpractice or in which either has been exempted under the discretionary exemption doctrine.[3]

Although we do not consider these cases analogous, there is a split of authority on the question of the Government's liability for alleged negligent release of patients. In Smart v. United States, 207 F.2d 841 (10 Cir., 1953), the patient, who had been released from the hospital for a visit to his father, stole an automobile and had a wreck involving the plaintiff. There the Fifth Circuit held that the decision to release the patient on parole was discretionary and within the statutory exemption. We think the case's value as a precedent is very much weakened by the Court's statement that the only negligence with which the defendant was charged was the failure fully to inform the patient's father of his true condition, thus causing the father to assume full responsibility for the visit. The Court found, however, that the hospital had in fact fully informed the father of the patient's condition, thus we feel that the decision on its facts holds the hospital exempt because it followed regulations without negligence. In Fair v. United States, 234 F.2d 288 (5 Cir., 1956) the Fifth Circuit rejected the discretionary exemption in a case in which

the hospital negligently released an insane patient who carried out previous threats to kill the plaintiff's intestate and others. We think that the holdings in both of these cases permit a distinction between the original extension of Government hospitalization and the termination of its service. They tend to support the conclusion that, once having exercised the discretion to extend the service the Government is liable for negligent treatment of the patient as well as for injuries caused by a patient who has been negligently released from treatment.

 Having reached the conclusion that the Government is not exempt in this case either under the charitable immunity doctrine or the discretionary function exemption provisions of the Tort Claims Act, we feel it advisable to remand the case for further consideration upon the merits. The District Court reached its decision on the merits based on the pleadings and the oral testimony offered by the Government at the pre-trial hearing on its affirmative defenses. While it is true that the Court offered the plaintiff additional time in which to produce evidence which would contradict the facts testified to by the defendant's doctors, we do not think the case a proper one in its then posture for summary judgment on the issue of negligence. There do exist genuine issues of fact and inferences of mixed law and fact to be drawn from the evidence before the Court. Although the plaintiff may not be in position to contradict the basic historical facts, he may wish to offer additional testimony as to the facts or expert opinion testimony to assist the Court in reaching its judgment. In Stevens v. Howard D. Johnson Co., 181 F.2d 390 (4 Cir., 1950), this Court said:

"but it [summary judgment] should be granted only where it is perfectly clear that no issue of fact

3. We note the case of Friedland v. United States, 209 F.Supp. 684 (D.C.Mass.1962) in which the Court declined to dismiss an action against a Veterans Hospital for negligent failure properly to supervise the plaintiff's intestate, allegedly a schizophrenic who died from a self inflicted wound while at large and not under adequate supervision. That case rejected the reasoning of the District Court in this case and rested its decision on Fair v. United States, 234 F.2d 288 (5 Cir., 1956).

is involved and inquiry into the facts is not desirable to clarify the application of the law. [Citing cases.] And this is true even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom."

See also Sartor v. Arkansas Natural Gas Co., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944) ; Berry v. Atlantic Coast Line R.R. Co., 273 F.2d 572 (4 Cir., 1960), Cert. denied, 362 U.S. 976, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960) ; Pierce v. Ford Motor Co., 190 F.2d 910 (4 Cir., 1951), Cert. denied, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951).

Reversed and remanded.