442 F.2d 1163
 Jim Nick NELMS, Lettie Baker Nelms and Lonnie Ray Nelms, Appellants,
v.
Melvin LAIRD, Secretary of Defense and Robert Seamans, Jr.,
Secretary of AirForce, and United States of
America, Appellees.
 No. 14568.
 United States Court of Appeals, Fourth Circuit.
 Argued March 3, 1971.
Decided May 28, 1971.
 
 George E. Allen, Sr., Richmond, Va. (court-assigned counsel) (Allen, Allen, Allen & Allen, Richmond, Va., on brief), for appellants.
 John F. Dienelt, Atty., Dept. of Justice, (William D. Ruckelshaus, Asst. Atty. Gen., and Alan S. Rosenthal, Atty., Dept. of Justice, and Warren H. Coolidge, U.S. Atty., E.D. North Carolina, on brief), for appellees.
 Before HAYNSWORTH, Chief Judge, and BOREMAN and BUTZNER, Circuit judges.
 BUTZNER, Circuit Judge:
 
 
 1
 To maintain its combat readiness, the United States Air Force regularly trains air crews in supersonic flight. Jim Nick Nelms, who lives in a rural community near Nashville, North Carolina claims military planes on a training mission from Beale Air Force Base in California caused sonic booms that damaged his house so extensively the building is now beyond repair. After unsuccessfully seeking satisfaction from the Air Force, Nelms brought this suit for $16,000 damages. The district court entered summary judgment for the government on the ground that supersonic flight training is a discretionary function within the meaning of the Federal Tort Claims Act (28 U.S.C. 1346(b), 2671-2680). We reverse.
 
 
 2
 * The Air Force, while denying that it damaged Nelms' house, conceded that a plane on a supersonic training flight caused a sonic boom near it on the day that he alleges the principal damage occurred. The Air Force contends, however, that notwithstanding the dispute over the effects of the sonic boom on Nelms' house, the discretionary function exception of the Federal Tort Claims Act releases it from any liability. To establish that supersonic flight training is a discretionary function, the Air Force relies on these uncontroverted facts: (a) the flight was authorized by the Commander-in-Chief of the Strategic Air Command in the exercise of his responsibility for the nation's air defense; (b) the specific flight plan was developed under the directions of the 9th Strategic Reconnaissance Wing according to Air Force Regulation 55-34; (c) the actual flight was conducted according to explicit directions regarding route, speed, and altitude from which the pilot did not deviate.
 
 
 3
 The Federal Tort Claims Act allows an action against the government for loss of property 'caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' 28 U.S.C. 1346(b). But the Act releases the government from tort liability for a claim 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.' 28 U.S.C. 2680(a). The discretionary function exception affords the government a defense 'where there is room for policy judgment and decision,' Dalehite v. United States, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953), and not when its employees are under a duty imposed by law to perform a mandatory act. Somerset Seafood Co. v. United States, 193 F.2d 631, 635 (4th Cir. 1951). See also O. Reynolds, The Discretionary Function Exception of the Tort Claims Act, 57 Geo.L.J. 81, 91 (1968).
 
 
 4
 Undoubtedly the Commander-in-Chief of the Strategic Air Command exercised a discretionary function in ordering supersonic training missions over land areas of the United States. The defense needs of the nation and the degree of air crew competence required to meet those needs are precisely the kind of decision that the Congress intended should not be second-guessed in a tort action. See Dalehite v. United States, 346 U.S. 15, 30, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). But the discretion of the Commander-in-Chief who authorized the training program and of his subordinates who planned the operating details of this specific flight over North Carolina was restricted by Air Force Regulation 55-34.[1] The regulation directed them to take detailed precautions in planning 'maximum protection for civilian communities.' AF Reg. 55-34 P3. Maximum, defined as 'greatest in quantity or highest in degree attainable or attained,' Webster's Third New International Dictionary (1964), must be given full effect in interpreting the regulation. That the regulation leaves no room for affording the public less protection is apparent from paragraph 4, which recognizes that despite all precautions, damage may result from sonic booms, and in that event, requires the Air Force to accept responsibility for restitution without qualification and pay all just claims.
 
 
 5
 The import of the regulation is similar to that of the Wreck Removal Acts (14 U.S.C. 86; 33 U.S.C. 409, 414) in Somerset Seafood Co. v. United States, 193 F.2d 631 (4th Cir. 1951). In that case, an oyster boat was stranded on the wreck of the old battleship TEXAS in Chesapeake Bay. The boat's owner brought suit under the Federal Tort Claims Act alleging that the government was negligent in creating and marking the wreck. Refusing to apply the discretionary function exception, we said:
 
 
 6
 'The Wreck Acts effectively dispose of the contention that the United States is relieved of liability here because, under 2680(a) of the Act, the Government is not liable for the breach of a discretionary duty and that the Government's duty here to remove or mark the wreck was discretionary. As we read the Wreck Acts, the duty of the United States to mark or remove the wreck is mandatory. The appropriate federal agencies and officers decide merely the proper methods or measures.' 193 F.2d at 635.
 
 
 7
 The parallel to Somerset is instructive. The Air Force concedes that the sonic boom was caused by an aircraft flying 70,000 feet or more over Nashville at three times the speed of sound. By the laws of physics, a pressure wave producing a sonic boom was unavoidable. While the decision to fly over North Carolina at supersonic speeds was discretionary, the degree of protection to be afforded civilians within reach of the sonic boom was not. In Somerset, a law, here, a regulation, placed the government employees under a mandate that gave them no discretion with regard to the protection they were required to afford the public.
 
 
 8
 The government relies on several cases that relieve the Air Force of liability for sonic booms under the discretionary function exception of the Act.[2] These cases, in turn, rely on Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), which dealt with the Texas City disaster of 1947. Nitrogen fertilizers, which the government permitted to be packaged and transported for export in an unsafe manner, caused a catastrophic explosion. The Supreme Court held that administrative decisions about packaging, labeling, testing, and transporting the fertilizer were discretionary and, therefore, not actionable. The Court applied the discretionary function exception to all of the government employees who made these decisions, not merely to those who authorized the export program. The administrative decisions, the Court said, 'were all responsibly made at a planning rather than an operational level and involved considerations more or less important to the practicability of the Government's fertilizer program.' 346 U.S. at 42, 73 S.Ct. 956, 971. However, no aspect of these administrative decisions included assessment of the risk or even expectation of the possibility that the fertilizer would explode. Recognizing this, the Court indicated that the likelihood of harm was too remote to render the government liable:
 
 
 9
 "There must be knowledge of a danger, not merely possible, but probable,' MacPherson v. Buick Motor Co., 217 N.Y. 382, 389, 111 N.E. 1050. * * * Here, nothing so startling was adduced. The entirety of the evidence compels the view that FGAN (fertilizer) was a material that former experiences showed could be handled safely in the manner it was handled here. Even now no one has suggested that the ignition of FGAN was anything but a complex result of the interacting factors of mass, heat, pressure and composition.' 346 U.S. at 42, 73 S.Ct. 956, 971.
 
 
 10
 The unforeseeability of harm in the Texas City explosion contrasted with the likelihood of harm from sonic booms raises a distinction so significant that Dalehite cannot be considered to control the case before us. By its reliance on the quoted language in MacPherson, the Court indicated that the exception is inapplicable when the government knows harm is probable. There is an obvious difference between the unencumbered right to make decisions for the general welfare and the unrestricted power to disregard predictable danger to the public at large. Here the release of a destructive force-- a sonic boom-- was deliberately planned, and the likelihood of harm to some civilians was known to exist despite all precautionary measures the planners could take. These factors, not found in Dalehite, make that case inapplicable.[3] The inability to prevent a deliberately released destructive force from causing harm, it seems to us, provides an appropriate limit to the discretionary function exception.
 
 II
 
 11
 Our holding that the exception is inapplicable does not, of course, render the Air Force liable. In order for Nelms to prevail, he must show that the damage to his property was caused by the negligent or wrongful act or omission of a government employee 'under circumtances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' 28 U.S.C. 1346(b). Since Nelms has been unable to show negligence either in the planning or operation of the flight, he necessarily relies on the doctrine of strict liability for ultrahazardous activities.
 
 
 12
 The Air Force again relies on Dalehite v. United States, 346 U.S. 15, 45, 73 S.Ct. 956 (1953), where the Court ruled that the government could not be held liable without fault even if the explosive fertilizer were a common law nuisance. But this circuit has held the government absolutely liable where state law imposes strict liability on private persons. United States v. Praylou, 208 F.2d 291 (4th Cir. 1953), cert. denied, 347 U.S. 934, 74 S.Ct. 628, 98 L.Ed. 1085 (1954). In that case, Judge Parker distinguished between possession of a dangerous property, the point argued in Dalehite, and the operation of a dangerous instrument. 208 F.2d at 295. Praylou has been cited by the Supreme Court in Rayonier, Inc. v. United States, 352 U.S. 315, 319 n. 2, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), a case which admonishes that it is not a judicial function to read exemptions into the Tort Claims Act beyond those provided by Congress. Praylou is on point, and we see no reason to reconsider it. See also, United States v. Pendergast, 241 F.2d 687, 688 (4th Cir. 1957).
 
 
 13
 The Air Force's liability to Nelms depends, then, on whether under the laws of North Carolina a private person would be required to compensate him. The North Carolina Supreme Court has imposed the standard of strict liability with respect to concussion damage caused by blasting, Guilford Realty & Ins. Co. v. Blythe Bros. Co., 260 N.C. 69, 131 S.E.2d 900 (1963). In adopting the majority view of blasting cases, the Court relied on the rule appearing in the Restatement of Torts 519-20 that whoever engages in ultrahazardous activities is absolutely liable for resulting harm. Nevertheless, sonic booms cannot be classified as ultrahazardous solely on the authority of the blasting cases, for even though sonic booms apparently produce effects much the same as concussions accompanying an explosive blast, they cannot be deemed ultrahazardous simply because the forces causing damage are comparable. Rather, if one who engages in supersonic flight is to be held strictly accountable, his action must on its own merit satisfy the criteria set out in 520 of the Restatement:
 
 
 14
 'An activity is ultrahazardous if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage.'
 
 
 15
 In two respects, classifying supersonic flight as ultrahazardous presents no difficulty. First, as required by 520(a), utmost care cannot presently eliminate sonic booms from supersonic flight; second, supersonic flight is not a matter of common usage, and the requirement of 520(b) is readily met.
 
 
 16
 The seriousness of the risk of harm presents a more difficult analytical problem. North Carolina law no longer regards the mere operation of an aircraft as ultrahazardous.[4] The risk of damage from sonic booms, however, is different in kind from the risk of damage from airplane crashes, forced landings, or the discharge of debris onto the land below-- occurrences which gave aviation its early classification as an ultrahazardous activity.[5] See Restatement of Torts 520 com. b, d, e. The degree of risk inherent in subsonic flying depends on the likelihood that some part of the aircraft will come down in an unintended place. Here the issue is whether a force known to be a constant companion of supersonic flight is so uncontrollable that, on occasion, its strength will reach destructive proportions.
 
 
 17
 Normally, we would require that an evaluation of the seriousness of the risk created by supersonic flight be made largely on the basis of competent evidence introduced at trial. For even though the normal pressure distribution in a sonic boom is generally understood, variations in pressure due to meteorological phenomena and topological features apparently do occur.[6] But in this case, we can rely on the Air Force's own assessment of the potential for harm from sonic booms. Air Force Regulation 55-34[7] provides a satisfactory basis to meet the requirements of 520 of the Restatement. In paragraph 3 it orders maximum protection to be afforded civilian communities. In paragraph 4 it says that damage may nonetheless occur. The regulation, therefore, is a frank admission that the potential for destructiveness from sonic booms is a continual risk of supersonic flight. Since the Air Force is in the best position to affirm that, despite the utmost care, sonic booms pose a substantial risk to the property of others, it should not be permitted to prove otherwise.
 
 III
 
 18
 Nelms also claims that he has a constitutional right to recovery because his property has been taken without just compensation. Nelms did not press his constitutional claim in the district court, though his complaint, broadly read, is sufficient to embrace it. The district judge understandingly dealt only with Nelms' cause of action under the Federal Tort Claims Act. Nelms' pleading and proof present a record too sketchy for initial consideration of this important constitutional question in an appellate court.
 
 
 19
 The summary judgment entered by the district court is vacated, and this case is remanded for trial. With regard to the cause of action based on the Federal Tort Claims Act, the sole issue to be tried is whether sonic booms damaged Nelms' home, and, if so, the extent of the damage. Nelms also should be allowed to amend his complaint to plead more specifically his cause of action based on the Fifth Amendment. On this issue, Nelms must establish that the damage, if any, to his home amounted to a taking of his property without just compensation.
 
 
 20
 Vacated and remanded.
 
 
 
 [1]
 Air Force Regulation No. 55-34 provides in part:
 '3. Check List of Protective Measures. Commanders should use the check list below in planning the maximum protection for civilian communities. The measures outlined should be used whenever feasible. Commanders are also urged to take any other action they consider advisable to carry out the purpose of this regulation. Sonic and Supersonic Flight
 'Sonic and supersonic flights will be conducted at altitudes above 30,000 feet over land areas, and above 10,000 feet over water areas. Sonic booms will not be intentionally generated except:
 '(1) During tactical missions which necessitate sonic or supersonic speeds;
 '(2) During phases of formal training flights, which require sonic or supersonic speeds. When such flights are required, they will be conducted over specially designated areas under close supervision;
 '(3) During research, test, and operational suitability test flights which require sonic or supersonic speeds; these flights must be conducted over areas designated for this purpose;
 '(4) When authorized by a major air command for demonstration purposes, provided all such demonstrations are coordinated with HQ USAF (SAFOR) at least five work days in advance.
 '(5) In an emergency when, in the judgment of the pilot, safety justifies a deviation from this general policy.
 '4. Sonic Boom Logs. The characteristics of the sonic boom phenomenon are such that damage may occur as a result. When a civilian area has been affected by Air Force aircraft, the Air Force must accept responsibility for restitution and payment of just claims. To assist in determining whether or not alleged claims are valid, all units which operate aircraft capable of supersonic flight will maintain an accurate record of all supersonic flights on AF Form 121, Sonic Boom Log.
 '5. Sonic Boom Inquiry System. A computerized Central Sonic Boom Repository has been established at HQ USAF to maintain records of all Air Force and Air National Guard supersonic flight activity within the CONUS and facilitate the processing of inquiries and damage claims. * * *
 '10. Sonic Boom Complaints. Upon receipt of a damage complaint or claim within the continental limits of the United States, the Base Staff Judge Advocate will complete AF Form 128, 'Sonic Boom Inquiry,' and forward it to Data Automation which will enter the applicable Installation Code * * *.'
 '11. Sonic Boom Inquiry Response. A Sonic Boom Inquiry response, obtained from the central computer, and containing information as to possible USAF activity causing the disturbance will be forwarded in duplicate to the inquiring officer by HQ USAF %(Afjald). t/he requesting Staff Judge Advocate will then replot the suspect supersonic flight paths to determine the possibility of Air Force involvement. * * *'
 
 
 [2]
 Maynard v. United States, 430 F.2d 1264 (9th Cir. 1970); McMurray v. United States, 286 F.Supp. 701 (W.D.Mo.1968); Schwartz v. United States, 38 F.R.D. 164 (D.N.D.1965); Huslander v. United States, 234 F.Supp. 1004 (W.D.N.Y.1964)
 
 
 [3]
 Additionally, the employees, in Dalehite were not subject to a regulation comparable to AFR 55-34
 
 
 [4]
 The North Carolina legislature, which adopted the Uniform Aerodynamics Act in 1929, repealed in 1947 5 of the Act, which adopted the Uniform Aerodynamics Act in 1929, repealed in 1947 5 of the Act, which makes 'the owner of every aircraft * * * absolutely liable for injuries to persons or property on the land * * * beneath.' Laws of 1947, c. 1069 3, formerly N.C.Gen. Stat. 63-14. Nevertheless, this action by the legislature has no bearing on the classification of supersonic flight because 63-14 of the Act was adopted when sonic booms were unknown and repealed when experience with sonic booms was virtually nonexistent. We assume, therefore, that the legislature was not dealing with sonic booms and that the common law of North Carolina as set forth in Guilford Realty & Ins. Co. v. Blythe Bros. Co., 260 N.C. 69, 131 S.E.2d 900 (1963) is applicable
 
 
 [5]
 The American Law Institute recommends that strict liability be imposed for ground damage from sonic booms. Restatement (Second) of Torts 520, com. c and d (Tent.Draft No. 11, 1965); Restatement (Second) of Torts 520A (Tent.Draft No. 12, 1966)
 
 
 [6]
 For a discussion of the characteristrics and some of the effects of sonic booms, see United States v. Gravelle, 407 F.2d 964 (10th Cir. 1969); Dabney v. United States, 249 F.Supp. 599 (W.D.N.C.1965); Sonic Booms-- Ground Damage-- Theories of Recovery, 32 J. Air. L. & Com. 596, 603 (1966); 8 Am.Jur.2d Aviation 99 (1963)
 
 
 [7]
 See footnote 1, supra