**Ralph W. STATON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 80–0013–C.**

United States District Court, W.D. Virginia, Charlottesville Division.

June 13, 1983.

Paul Reiber, McLean, Va., for plaintiff.

John Perry Alderman, U.S. Atty., Roanoke, Va., for defendant.

## MEMORANDUM OPINION

TURK, Chief Judge.

On November 28, 1977, United States Park Ranger Douglas M. Bowen shot and killed three dogs, owned by plaintiff, in the Shenandoah National Park. Plaintiff thereafter sued the United States for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* (FTCA). After a non-jury trial, this court entered judgment for the defendant, ruling that the acts complained of were "discretionary," and therefore not actionable. 28 U.S.C.

§ 2680(a). The Court of Appeals reversed, holding that the shootings were not discretionary. *Staton v. United States,* 685 F.2d 117 (4th Cir.1982). The case was remanded with instructions that this court make additional findings as to the issues of Bowen's due care, 685 F.2d at 121, and plaintiff's contributory negligence. 685 F.2d at 121 n. 4. After considering proposed findings of fact and conclusions of law submitted by the parties, the court is prepared to render its verdict.

## I. FINDINGS OF FACT

1. Shenandoah National Park ("Park") is a federally owned wildlife refuge located in the Blue Ridge Mountains of Virginia. In north central Virginia, adjacent to the common border of Madison and Greene Counties, a portion of the National Park juts out toward the east (see map, attached as appendix no. 1). Between Fork Mountain to the north and Jones Mountain to the south, where the shooting of the plaintiff's dogs occurred, the Park is about a mile wide. State owned land, designated as "Virginia Wildlife Area," borders the Park, at that point, both to the north and to the south. The land south and east of the Park, and east of the State land, is privately owned.

2. The first day of the bear hunting season in 1977 was November 28. On that day, individuals could lawfully hunt bear, on private land, with the assistance of dogs, and on State land, but without dogs. Bear hunting in the Park, with or without dogs, was prohibited.

3. Prior to 1977, Park officials had experienced difficulty with poachers in the previously described area. (Tr. 390–91). Because the Park is relatively narrow there, hunting dogs could be employed to run wildlife through onto nonfederal land into the guns of waiting hunters. In 1977, the federal authorities decided to concentrate their enforcement efforts around that place.

4. Pursuant to this resolve, the Park officials distributed a press release, pointing out the problem, and indicating that Park regulations would be "vigorously enforced."

(Gov't Exh. 10). The release was distributed to some 200 individuals, organizations, and media sources. (Gov't Exh. 11). The authorities also closed off Fork Mountain Road where it entered the Park from the Rapidan Area northeast of where the shootings occurred; a gate was placed across the road.

5. To further inform hunters of their intentions, Park authorities prepared a handout, which they distributed to hunters on opening day. (Pl.Exh. 1). The handout set forth 36 C.F.R. § 2.8(a) and (d) which provides:

> (a) Dogs, cats and other pets are prohibited unless they are crated, caged, or on a leash, or otherwise under physical restrictive control at all times.

> \* \* \* \* \* \*

> (d) Dogs, cats or other pets running at large and observed by an authorized person in the act of killing, injuring or molesting humans or wildlife may be disposed of in the interest of public safety and protection of wildlife.

Also printed on the handout was a "Note" which said: "Dogs observed in the Park, chasing any animals will be caught and impounded. Capture methods will be by hand or dart injected tranquilizer drugs. All such dog owners will be cited and subject to fees under Section 5.11."

6. The handout, including the "Note," was drafted by Ranger Personnel in the Big Meadows district of the Park. Douglas M. Bowen, who was then District Ranger over the southern half of the Park, from Big Meadows to Afton Mountain, probably did not personally draft the handout, but he accepted responsibility for its contents. (Tr. 359). Larry Hakel, the Park's Chief Ranger, saw the handout prior to its distribution, and did not object to it. (Tr. 416). It was also probably reviewed by Robert R. Jacobsen, the Park Superintendent. (Tr. 362–63).

7. At least one member of plaintiff's hunting group received a copy of the handout from Park Rangers on November 28, 1977. (Tr. 42). Plaintiff, however, did not

see the handout after the shootings. (Tr. 248).

8. No dogs had been killed by Park personnel in recent memory, save a deranged animal which was a threat to humans. Otherwise, the usual, informal policy regarding domesticated dogs found on Park lands was to capture and impound them and notify the owners, who would pick them up. Sometimes they would be fined, but not invariably; this was left to the discretion of the Ranger involved. No evidence was presented at trial which would indicate whether dogs captured in the past had, when caught, been actively engaged in chasing or otherwise molesting wildlife. In his memorandum filed April 22, 1983, however, plaintiff makes reference to a letter, not a part of the record of this case, written by Superintendent Jacobsen. In it he indicates that two dogs were once captured by hand after driving some deer into the freezing water of a stream and holding them at bay there. Such an occurrence, though, does not alter the basic conclusion that some circumstances would justify departure from the informally established policy. Apparently, in that case, the ranger involved decided that adherence to the policy was feasible. The record does not support plaintiff's contention that the Park Service had an *affirmative,* long standing policy of not shooting dogs.

9. Douglas M. Bowen, then District Ranger over the Park's southern half, was responsible for the supervision of lower level supervisors. His ordinary responsibilities included "management, budget, some field operations, encroachments, resource management, ..." and the like. (Tr. 308).

10. On November 28, 1977, Bowen drove from his home in Big Meadows, through the Rapidan area, into the Park, on Fork Mountain Road. Arriving around dawn, he traversed the gate closing that entrance to the Park, and stationed himself, in a Park Service pickup truck, within sight of the gate. His intention was to advise hunters and address inquiries. (Tr. 317).

11. As he waited, Bowen monitored channel 13 on his citizen's band radio. Hunters' voices flooded the frequency. They described chases, exchanged information, and revealed locations. They also warned of the presence of Park Rangers, or "Park Devils" (Tr. 323), and one man said "'They [some dogs] ran a big one through. I didn't get a shot at him.'" (Tr. 323). Other transmissions led him to believe that dogs were present at Camp Hoover, which is in the Park. (Tr. 325). *See generally* Tr. 320–26. The traffic that Bowen intercepted bothered him. (Tr. 376).

12. Plaintiff's party communicated on citizen's band channel 7. No evidence was presented to suggest that those hunters deliberately tried to run bear through the park.

13. Attempting to locate the chases described over the radio, Bowen drove the truck up and down Fork Mountain Road, between the gate and "the Sag," located west of the gate, where the narrow patch of Park land at issue here connects to the main body of the Park. While at the gate, he heard dogs from the south, and thought that they were moving up toward the Park. So he drove west again, toward "the Sag." When he got there, he could still hear the dogs baying. The dogs were "excited" and, based on his experience, he thought that they were in "full baying pursuit" of something. (Tr. 332).

14. As Bowen had gone about preparing for his official duties, plaintiff and his companions had prepared for the hunt. They numbered about twenty. Plaintiff accompanied them but did not participate in the shooting; he brought along nine dogs to assist the hunters. Spec, Blue and Gyp were among these. At about 8:00 or 8:30 a.m., the dogs were released between Graves Mill and Bluff Mountain, approximately one mile from both State and federal land. This was on private property, for which plaintiff and his party had obtained leases or licenses to hunt.

15. The hunters stationed sentries along the Park boundary. Their duty was to divert dogs from forbidden territory. (Tr. 186, 201–02). Other hunters followed the dogs.

16. A group of dogs got onto the scent of a bear around "McKinzie Hollow," also known as "Bear Church Ridge." This is marked as "Jones Mountain Trail" on the attached map; it is close to the point where federal, State, and private lands meet, between Bluff Mountain and Jones Mountain. The dogs chased the bear onto State lands, and they circumvented Bluff Mountain. The hunters followed the chase as far as Jones Mountain Trail, where they stopped, about twenty yards from the Park boundary.

17. The dogs, however, after circling Bluff Mountain, continued north onto Park lands. This was the chase, apparently, that Bowen heard coming from where he sat on Fork Mountain Road.

18. Bowen saw a small black bear—neither a cub nor an adult—skitter down a hill, across Fork Mountain Road, and into a "draw" (which is, presumably, a gully or ravine). (Tr. 333). It crossed the road 100 to 150 feet from Bowen. (Tr. 379).

19. Bowen was armed with a six shot Wesson revolver, issued by the Park Service, and his personal double barrel, twelve gauge shotgun.

20. Bowen had recently been certified to operate a tranquilizer gun, which requires special training. (Tr. 328–29). He was not equipped with one, however, when the incident occurred. Only four such guns were assigned to the Park, one in each subdistrict. The one assigned to Big Meadows was then in the hands of one Bruce Rodgers, who was three to five miles away in the Rapidan area. (Tr. 382–83).

21. Bowen thought that the dogs might chase the bear out of the Park and into the Rapidan area. (Tr. 339–40). Witnesses for plaintiff testified that, had that occurred, they would have shot the bear, would that have been possible. Tr. 69, 82–83.

22. About one minute after the bear crossed the road, a dog scampered down the hill "in full baying pursuit." This was "Gyp." Bowen hailed Gyp. The dog ignored him, and crossed the road. Bowen then shot Gyp, when she was twenty to thirty feet below the road, and twenty to forty feet from Bowen. (Tr. 369–70). Bowen did not know whether Gyp was chasing directly behind the bear, or trying to intercept it at an angle. (Tr. 369).

23. Approximately thirty seconds later, Blue came running down the hill. Bowen hailed Blue and was ignored. Bowen shot Blue, while the dog was on the road, with the shotgun. Blue continued over the road and came to rest in a pine thicket. (Tr. 336).

24. Spec followed, fifteen to thirty seconds later. He did not run as fast as the other two, but was in "full baying pursuit." Bowen whistled and Spec hesitated. Then Spec resumed his chase and Bowen shot him with his service revolver, both barrels of the shotgun having been spent. Spec was five to ten feet from Bowen when he was shot, apparently on the south edge of the road. (Tr. 374–75).

25. Bowen dragged Spec over the road into the thicket, to hide him. (Tr. 341, 357). This was in accordance with informal park policy at the time; the policy has since been changed, and, in the event of a like occurrence, owners will now be notified. (Tr. 396–98).

26. Bowen found that one of the other dogs was still breathing, and he killed it with his revolver. (Tr. 343). Bowen testified that this was the "second" dog, or Blue. (Tr. 343). Dr. Wilson's testimony, however, suggests that Gyp, who came first, was twice shot. (Tr. 155–61). Whichever it was, it is not relevant to the disposition of this case.

27. Ten to fifteen minutes after Bowen first saw the bear, another group of dogs ambled by, not apparently in close pursuit of anything. They were only "woofing." Bowen let them go. (Tr. 345–47).

28. Plaintiff introduced evidence tending to suggest that the dogs were shot from the front and thus, by extrapolation, while they were on the hill, and not yet to the road. (Tr. 159–65). This conclusion is rejected. The conclusions plaintiff seeks to have this court draw from Dr. Wilson's

examinations of the dogs is too speculative and subject to too many variables. Bowen's eyewitness testimony is much more reliable, and this court found him to be a credible and accurate witness, based on his demeanor and the content of his testimony.

29. Since the 1977 shootings, plaintiff has hunted with dogs in the same general vicinity. (Tr. 284–88). This tends to discount his testimony that, had he known the Park Rangers would shoot dogs, he would not have hunted there. (Tr. 239).

## II. CONCLUSIONS OF LAW

### A. *Ranger Bowen's Negligence*

■ 1. Bowen's failure to tranquilize or capture the dogs in accordance with the "note" accompanying the handout was not "negligence *per se.*" Although the "note" could be interpreted to suggest that Park Rangers were thereby *prohibited* from shooting and killing dogs found in the Park, a more plausible construction is that the "note" attempted to incorporate the Park's informal policy. That policy, assuming it existed, was a practical one, designed to preserve the lives of as many animals as was possible, and to avoid needless waste. Implied in such a policy, however, was that it would only be adhered to when that was possible. Certainly, cases more extreme than this one can be envisioned, when the shooting of a dog would be absolutely necessary in order to vindicate an overriding concern; the shooting of the deranged dog, which was threatening human safety, is an example. In such cases, it would not be reasonable to expect Park personnel to stand by and do nothing because of any such "policy." This being so, deviation from the "policy" cannot be negligence *per se.*

■ 2. In addition to the foregoing consideration, the court also concludes that the "note" was not the type of enactment, the violation of which constitutes automatic negligence. For some purposes, informal pronouncements of a regulatory body may be binding on that body. *See, e.g., United States v. Heffner,* 420 F.2d 809 (4th Cir.

1969) (conviction for tax fraud reversed when Internal Revenue Service agent interviewed defendant in a manner violative of agency "instructions" to agents). *Accord, McCourt v. Hampton,* 514 F.2d 1365, 1370 (4th Cir.1975). It does not necessarily follow, however, that violations of such pronouncements constitute negligence *per se* under the Federal Tort Claims Act. One of the cases cited by plaintiff, in fact, holds specifically that they do not. *Downs v. United States,* 522 F.2d 990, 1002 (6th Cir. 1975) (adopting conclusion of District Court, found in 382 F.Supp. 713, 755 (M.D.Tenn. 1974)). Another case cited by plaintiff is *Nelms v. Laird,* 442 F.2d 1163 (4th Cir.1971). That case held, as did the Court of Appeals in this matter, that the existence of a particular regulation rendered certain behavior non-discretionary for purposes of the FTCA. It did not hold that failure to follow such regulations was *per se* negligence. In any event, the Supreme Court reversed *Nelms v. Laird. Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972).

■ 3. Further, the "note" was by no means an official, formal regulation. None of the witnesses knew precisely who drafted it. Such "regulations," which may more properly be termed "guidelines," do not carry with them the special criteria that statutes and formal regulations do, which criteria justify the imputation of negligence to those who violate them.

> By the very terms of the hypothesis, to omit, willfully or heedlessly, the safeguards prescribed by law for the benefit of another that he may be preserved in life or limb, is to fall short of the standard of diligence to which those who live in organized society are under a duty to conform.

*Martin v. Herzog,* 228 N.Y. 164, 126 N.E. 814 (1920) (Cardozo, J.). When a legislative body has established a statutory obligation, it is understandable that violation of that statute should constitute a breach of a duty to members of the public, and tort liability follows naturally. *See, generally,* Thayer, *Public Wrong and Private Action,* 27 Harv. L.Rev. 317 (1914). It is especially under-

standable when the obligation imposed is statutory: the statute has been passed by a legislative body which, in theory, speaks for the electorate, which is the public. It follows, however, that as the enactment becomes more and more removed from the legislature and concomitantly less informed with deliberation by a democratic body, it begins to lose the justification for creating a civil duty of care. Thus, the violation of a statute will constitute *per se* negligence. So, too, will the breach of a validly enacted regulation which, ordinarily, is authorized by, and constitutes a gloss on, some statute. This will not be so, however, when the enactment violated is an informal guideline issued by a lower level administrator; this is nothing but a dictatorial fiat. A statute, arrived at collectively, is almost by definition a description of how a fictional, composite, "reasonable man" should behave. This is not true of the "note," which was composed by one or several Park Rangers, and which simply did not result from the sort of deliberative processes impliedly contemplated under the *per se* negligence doctrine.[1] Accordingly, Bowen's failure to heed the "note" was not negligence *per se.*

4. Plaintiff also maintains that Bowen's use of his personal shotgun to shoot two of the dogs, in violation of Park Service guidelines, constituted *per se* negligence. The record contains no evidence, however, that those guidelines were validly promulgated regulations; rather, they appear to have been informally adopted guidelines akin to the "note" found on Plaintiff's Exhibit 1. Accordingly, use of a private gun was not negligence *per se,* for the reasons stated in the foregoing two paragraphs.

5. Moreover, even were Bowen negligent in carrying his personal shotgun, any such negligence certainly was not a proximate cause of the death of the dogs. Whether he used his own gun or the Park Service's was completely fortuitous. Counsel for plaintiff stated, at oral argument on June 9, 1983, that the purpose of the "regu-

lation" was to insure that rangers were qualified to have guns. Since Bowen did have a service revolver, he must have been qualified to carry at least *that* gun. Further, even were he not qualified by the Park Service to carry a shotgun, the court concludes that any causal relationship between the violation of the "regulation" and the shooting of the dogs was far too remote to consider the former to be a proximate cause of the latter.

6. Accordingly, Bowen's behavior must be adjudged by the applicable negligence standard under Virginia law. "To constitute actionable negligence, there must be a legal duty, a breach thereof, and a consequent injury which could have been reasonably foreseen by the exercise of reasonable care and prudence." *Jordan v. Jordan,* 220 Va. 160, 257 S.E.2d 761, 762 (1979).

7. In *Breedlove v. Hardy,* 132 Va. 11, 110 S.E. 358 (1922), the court said:

Where the proof of the killing of the dog is clear, the burden is then upon the defendant, who justifies his action, to show the necessity therefore. In this case the defendant justified the killing because he claimed that it was necessary in order to protect his turkeys and chickens from repeated attacks and injuries by these dogs. This right may be thus defined: The owner of domestic animals or fowls has the right to defend them from injury or destruction through the attacks of other animals, but the extent of such right of defense necessarily depends on the circumstances and necessities of the particular case, that is, whether or not the right is reasonably or properly exercised, so as to make it lawful and justifiable.

\* \* \* \* \* \*

As a general proposition it may be said that, where this defense of the right to kill is made, the question is one of fact for the jury, to be decided after due

---

1. For example, under the Administrative Procedure Act, interested parties are given notice of prospective regulations and an opportunity to

comment thereon. 5 U.S.C. § 553. The "note" was preceded by no such procedure.

consideration of all the peculiar circumstances relating thereto.

110 S.E. at 359.

8. Although plaintiff's three dogs were chasing a wild bear and not domesticated animals, the foregoing principles should apply. These demonstrate that Bowen had the right to shoot the dogs to protect the bear, but the government must prove by a preponderance that the shootings were reasonably justified by the peculiar facts and circumstances of this case.

■ 9. The government has met its burden. Bowen had good reason to believe the dogs would chase the bear onto land where hunters could and would shoot it; this was apparent from the area's prior history, from the radio transmissions he overheard, and from the path of the animals. The dogs were fairly close behind the bear, and it was reasonable for Bowen to think the bear might not elude them before leaving the Park. Bowen tried to deter the dogs by yelling at them, but his calls were ignored. He did not have a tranquilizer gun; however, there was only one such gun in the subdistrict, and it was five miles away, in the hands of another Ranger. (Plaintiff does not suggest that the Park Service itself was negligent in failing to issue more guns to the Rangers, and the court concludes that it was not. In any event, the number of such guns issued would be a matter of discretion, and not actionable. 28 U.S.C. § 2680(a).) Given this fact, and also the fact that Bowen's primary duty that morning was to advise hunters and not to protect against marauding dogs, his failure to have a tranquilizer gun was not negligent. Further, Bowen had little time in which to make a decision. Perhaps he could have done something different if he had time for informed deliberation. There is no evidence, however, that Bowen knew of these dogs or their purportedly temperate dispositions, so it was not unreasonable for him not to attempt to capture them by hand, even were that possible. What he did

was to make a spot determination to "dispose" of them in a manner which to him, at the time, seemed appropriate. The Park Regulations allowed him to do just that. Under the facts and circumstances as found by this court, Bowen's actions were reasonable and not negligent.

10. This conclusion is consistent with the Court of Appeals' decision reversing this court's initial ruling. The Court of Appeals held that Bowen's actions were not "discretionary" for the purposes of the FTCA. Implicit in the order remanding the case for further consideration, however, as well as in the statute itself, which exempts separately discretionary acts and acts of due care, is the notion that one may exercise due care even when one fails to perform an act which, for the purpose of § 2680, is not discretionary. Obviously, adherence to any established policy may be excused under appropriate circumstances.

**B. Plaintiff's Contributory Negligence**

■ 11. Even if it were to be assumed that Bowen was negligent in despatching the dogs, the court would still conclude that, as a matter of law, plaintiff's contributory negligence would bar his recovery.[2] *Standard Oil Co. of New Jersey v. Roberts,* 130 Va. 532, 107 S.E. 838 (1921). Plaintiff was negligent *per se* because, by allowing his dogs to run onto Park property, he violated several regulations and statutes. Negligence *per se* can bar plaintiff's recovery if it was a proximate cause of the injury. *Id.*

12. By allowing his dogs to run onto Park land, plaintiff violated 36 C.F.R. § 2.8(a) and (d). *See* ¶ 5, *supra.* He also appears to have violated Va.Code § 29–171, which provides: "It shall be unlawful for any person ... to violate any regulation of the Commission concerning ... public shooting ... preserves ... in forest ... areas owned by the United States government ..., or permit his dog ... to go thereon .... The purpose of at least the federal regulation is to protect wildlife. 16

---

**2.** The court reiterates that it considers its foregoing findings and conclusions, that Bowen

was *not* negligent, to be controlling.

U.S.C. § 403c–3. Presumably, this is also true of the Virginia statute. Accordingly, plaintiff's breach of those laws created the very condition they were designed to prevent. This constitutes negligence *per se.* *Smith v. Virginia Transit Co.,* 206 Va. 951, 147 S.E.2d 110, 114–15 (1966).

13. Even if not negligent *per se,* plaintiff was negligent under a reasonableness standard in releasing his dogs so close to the Park boundaries. Alternately, he assumed the risk that they would run onto Park land and be shot when he did so. Plaintiff maintains that he did not assume a known risk, given the Park's "policy" of apprehending, rather than shooting, dogs. His belief in such a "policy," however, was not justified. As has been held, there was no such "policy," but rather an informal manner of handling such matters by the Park Service. *See* ¶ 8, *supra.* Plaintiff could not have relied on the handout, for he never saw it prior to the shooting. The regulations then in force allowed the Park Service to "dispose" of dogs molesting wildlife or humans; on one occasion, the Park personnel had shot a dog under precisely those circumstances.

14. Plaintiff's negligence contributed proximately to the shootings. Indeed, the dogs would not have been in a position to be shot, absent plaintiff's negligence. "The proximate cause of an event is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces that event, and without which that event would not have occurred." *Huffman v. Sorenson,* 194 Va. 932, 76 S.E.2d 183, 187 (1953). The injury must have been reasonably foreseeable by a prudent man. *Id.* It was reasonably foreseeable that, by allowing the dogs to run loose near the Park, they would chase wildlife within the Park, and be shot when met by Park personnel. Plaintiff's negligence "produced" the events in the manner required by the *Huffman* definition. The negligence was a substantial, and not a trivial cause of the incident. *Cooke v. Griggs,* 183 Va. 851, 33 S.E.2d 764, 766 (1945).

15. Plaintiff's contributory negligence is not excused by the "last clear chance" doctrine. That doctrine "allows a negligent plaintiff to recover only if his negligence was in fact not a proximate cause but only a remote cause or condition of the accident, and the negligence of the defendant was the sole proximate cause." *Cook v. Shoulder,* 200 Va. 281, 105 S.E.2d 860, 863 (1958).

16. The doctrine is complex and technical, and for that reason, "courts should be wary in extending its application." *Hutcheson v. Misenheimer,* 169 Va. 511, 194 S.E. 665, 667 (1938). It does not apply nicely to this factual situation. The doctrine states:

Where the injured person has negligently placed himself in a situation of peril from which he is physically unable to remove himself, the defendant is liable if he saw, or should have seen, him in time to avert the accident by using reasonable care. Where the plaintiff has negligently placed himself in a situation of peril from which he is physically able to remove himself, but is unconscious of his peril, the defendant is liable only if he saw the plaintiff and realized, or ought to have realized, his peril in time to avert the accident by using reasonable care.

*Greear v. Noland Co.,* 197 Va. 233, 89 S.E.2d 49, 53 (1955). *Accord, Brock v. United States,* 596 F.2d 93, 95 (4th Cir.1979). This case does not fit within that description of the doctrine because plaintiff's chattels— his dogs—were placed in peril, rather than himself. Further, the dogs were not placed into a "peril," from which Bowen, by exercising reasonable care, could have "extricated" them. Rather, the dogs were not in "peril" until Bowen decided to shoot them. Thus, the last clear chance doctrine would have to apply, if at all, in this manner: plaintiff's negligence placed the dogs in a situation where Bowen, by negligently deciding to shoot them, placed them in peril. At that point, Bowen had the "last clear chance" to avoid the accident, that is, by changing his mind and not shooting them. He negligently failed to change his mind,

however, and he therefore lost the last clear chance to save the dogs.

17. The court rejects such an analysis. It is a contorted application of a difficult rule. A better analysis is to consider the respective faults as a matter of proximate cause, which is the theory underlying the "last clear chance" doctrine. *See Cook v. Shoulder.* The defendant's negligence must in effect supersede that of the plaintiff, relegating it to a "remote" status. The doctrine "is inapplicable where the negligence of the plaintiff is continuing and concurs with that of the defendant as an immediate, proximate and efficient cause." *Craighead v. Sellers,* 194 Va. 920, 76 S.E.2d 212, 214 (1952).

18. In this case, assuming that Bowen was in some way negligent, his negligence did not supersede plaintiff's. Bowen was in a position to be negligent only because of plaintiff's actions. The actions of both persons combined to result in the shooting of the dogs.

19. Further, any negligence on Bowen's part was minimal. He had, essentially, only several alternatives: to kill the dogs, to wound them, to tranquilize them, to capture them, or to let them go. Any negligence was in his choice from among those alternatives. Because he had only a few moments to weigh the alternatives and select from them, any negligence was slight. Plaintiff's fault was much greater: he did not need to decide quickly whether to let loose the dogs near the Park rather than somewhere else. The choice was made in pursuance of a planned hunting trip.

### SUMMARY AND CONCLUSION

For the foregoing reasons, judgment must enter for the government. Bowen was not negligent, under the facts and circumstances of this case, when he shot the dogs. Even if he was negligent, it was slight, and plaintiff's contributory negligence bars recovery. The "last clear chance" doctrine does not excuse plaintiff's contributory negligence under these facts.

An appropriate order will enter.